## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

Patrick Joseph Charest, #182262                    *

        Plaintiff,                    2008 AUG 20  A 10: 15

                          *

Vs.                    DEBRA P. HACKETT, CLK
           U.S. DISTRICT COU**2:07-CV-984-MHT**
           MIDDLE DISTRICT ALA

Alabama Pardon & Paroles et. al.,                    *

        Defendants.                    *

### RESPONSE / REPLY TO DEFENDANT
### WYNNE's UNSUPPORTED SPECIAL REPORT
### AS FILED ON 7/02/08

COME NOW Patrick Joseph Charest (hereinafter "CHAREST") moves this

Honorable Court to respectfully review as shown upon this Court as follows:

FIRST, Defendant Wynne answered separately, than that of his co-defendants, so Charest

more than likely would assume that said Special Report, dated above as received by

Charest —which will necessarily be responded to accordingly, throughout as follows:

DEFENDANT Wynne's *Defenses* stated at page 3, §§ 1 -4 that:

> "The Eleventh Amendment of the U.S. Constitution prohibits
> Plaintiff from prosecuting this action against the State of
> Alabama. The Board of Pardon and Paroles is an arm of the
> State of Alabama, and is not subject to suit.

> "Furthermore, the State of Alabama is not a *"person"* that can
> be liable under 42 U.S.C. §1983, *Will vs. Michigan Dept. of
> State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45
> (1989). Even if the Board were not immune, it could not be
> sued under §1983, as the statute creates a cause of action only
> against *"persons"* who act under color of State law. The U.S.
> Supreme Court has expressly held that State are not persons
> within the meaning of the statute on which Plaintiff relies.

> "Wynne participated in the parole consideration hearing
> wherein Charest was denied parole on 12-6-2005. (See
> **Exhibit "A"** of *Special Report Board Order dated 12-6-2005).
> Wynn was a Special Board Member at the time and has

subsequently been appointed to the Board as its Chairman."
Id.

§ 1.        Charest maintains, and replies in accord with the Eleventh Circuit –that the

"*Eleventh Amendment*," only bars suit(s) directly against a **state** or its **agency**, see

*Papasan v. Allian*, 478 U.S. 265 (1986); *Pennhurst State School & Hosp. v. Halderman*,

465 U.S. 89 (1984), thus since Charest is suing individual defendants, and not the state, or

the agency itself under §1983, the only "*persons*" Charest seeks to hold actionable in this

instant action are those whom "*caused or subjected*," the deprivation of known

Constitutional rights; as such remain personally actionable for individual wrongdoings.

### A.    **Eleventh Amendment Immunity**:

§ 2.        The Eleventh Amendment to the Constitution of the United States provides

that, "[t]he Judicial power of the United States shall not be construed to extend to any suit

in law or equity, commenced or prosecuted against one of the United States by Citizens of

another State, or by Citizens or Subjects of any Foreign State."

> While the Amendment by its terms does not bar suits against a State by its own
> citizens, this Court has consistently held that an unconsenting State is immune from
> suits brought in federal court by her own citizens as well as by citizens of another
> State. *Edelman v. Jordan*, 415 U.S. 651, 663-64, 94 S. Ct. 1347, 39 L.Ed.2d 662
> (1974). "Thus the rule has evolved that a suit by private parties seeking to impose a
> liability which must be paid from public funds in a state treasury is barred by the
> Eleventh Amendment." *Id. at 664*. The immunity provided to the states by the
> Eleventh Amendment also attaches to and protects individuals who are sued in their
> official capacities as well as state agencies and entities. This is because a suit against a
> state employee in his official capacity or against a state agency is in essence a suit
> against the state, as any monetary judgment obtained would be satisfied from state
> funds. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S. Ct. 2304, 105
> L.Ed.2d 45 (1989).

Since Charest is neither suing the State as a defendant, nor is Charest requesting or

asking for any monetary damages against Defendant Wynne –the State has "*no real*

*interest*," see *Hoffman v. Connecticut Income Department*, 492 U.S. 96, 106 L.Ed.2d 76,

109 S.Ct. 2818 (1989); likewise Charest avers that Defendant Wynne is not being sued as a

2

governmental official in his official capacity because such would actually be a suit against the governing entity itself. See *Kentucky v. Graham*, 473 U.S. 159, 167 n.14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), notwithstanding the Eleventh Amendment interpretation which would then, bar such instant action, absent Defendant Bill Wynne fitting such criterion – the Eleventh Amendment immunity is herein inapplicable to said remaining Defendant Wynne's assertion in his "*Special Report (7/02/08)*."

"Whether a defendant is an 'arm of the state' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003). In making this determination, this Court **must** considers four factors: (1) how the entity is defined by state law, (2) the State's degree of control over the entity, (3) the source of the entity's funding, and (4) who is responsible for judgments against the entity. Id., absent Defendants asserting such said affirmative defense and meeting the necessitating criterion –therefore Defendant Wynne's defense fails, under this umbrella.

In the landmark decision *Ex parte Young*, 209 U.S. 123, 52 L.Ed. 714, 28 S.Ct. 441 (1908), the Supreme Court recognized an exception to the general rule that a state official, acting in his official capacity, is immune from suit. The <u>*Young*</u> court held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law by a state official. <u>Id. at 155-56, 159.</u> In <u>*Eldeman v. Jordan*</u>, the Supreme Court interpreted <u>*Young*</u> expansively, holding that a federal court may impose an injunction that governs the official's future conduct but not one that awards retroactive monetary relief. 415 U.S. 651, 664-66, 39 L. Ed.2d 662, 94 S.Ct. 1347 (1974).

3

Simply put, the Eleventh Amendment does not bar claims for equitable relief against the individual Defendants in their official capacities, as long as those claims are only for prospective injunctive relief. *Ex Parte Young*, *supra*. *Young* and its progeny provide for prospective injunctive relief for the ongoing violations of federal law, and Charest requested for "*prospective declaratory and injunctive relief*," against further, future discriminatory actions. Therefore, the Eleventh Amendment as to the individual Defendants does not bar these claims in their capacity.      Moreover,      the      Eleventh Amendment sovereign immunity does not apply to bar relief under 1983 when a state official is sued for prospective injunctive relief to "*end a continuing violation of federal law*," as herein alleged, requested by Charest. *See Seminole Tribe of Florida*, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Although "*neither a State nor its official acting in their official capacities are 'persons' under 1983*," *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), a state official sued for prospective injunctive relief in his or her official capacity is a person under 1983, *see id. at 71 n.10*, as are state officials sued in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), thus Charest maintains that Defendant Wynne has not properly pled said immunity doctrine defense under *Will v. Michigan Dept. of State Police* progeny, therefore the application of said doctrine remains insufficient. See Defendant Wynne's "*Defenses*" at page 3.

Moreover this Court well knows better than Charest that State officials acting in their individual capacities are not protected by the sovereign immunity conferred by the Eleventh Amendment. *See Harden v. Adams*, 760 F.2d 1158, 1164 (11th Cir. 1985). The Eleventh Amendment also does not bar claims (for monetary or injunctive relief) against Defendant Wynne his individual capacities. *See Dean v. Barber*, 951 F.2d 1210, 1215 (11th

Cir. 1992). Thus Defendant Wynne, as made mentioned and preserved earlier against Defendants Weatherly, Longshore, is likewise not entitled to the "Eleventh Amendment" immunity, as erroneously asserted in his Special Report, *see Adams, supra*.

"Because qualified immunity is a defense not only from liability, but also from suit, it is 'important for a court to ascertain the validity of a qualified immunity defense "*when asserted by the named Defendants*" in the lawsuit.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting GJR Invs. Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11th Cir. 1998)). "The qualified immunity defense may be raised and addressed on a motion to dismiss, and will be granted if the complaint 'fails to allege the violation of a clearly established constitutional right.'" *Smith v. Siegelman*, 322 F.3d 1290, 1294 (11th Cir. 2003) (quoting Chesser v. Sparks, 248 F.3d 1117, 1121 (11th Cir. 2001)), however this Court in it's June 6th. 2008 ORDER specifically directed, at ¶ 4, pp. 1 -2, that "*No motion for summary judgment, motion to dismiss or any other dispositive motions addressed to the complaint, as amended, be filed by any party without permission of the court . . .*" *Id*.

This Court directed said parties, to first seek permission before filing such responsive pleading; Defendant Wynne has "yet" to seek such permission, prior too, thus Charest requests that this Court disregard Defendant Wynne's "*relief requested in his Conclusion,*" as to a ground not entitled too, see Wynne's p. 10 conclusory allegation(s): "*Charest has sued the State of Alabama, which is immune form suit. The State is not a person subject to §1983 liability*"; such defense is not remotely applicable to the distinct facts of three (3) claims against Defendant Wynne –therefore Wynne's requested relief is meritless, primarily because Charest has not sued the State, in this instant action.

Charest maintains that for the Defendants "to [have] received qualified immunity, those official's must first prove [they] were acting within the scope of discretionary

authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). "[A] government official [must] prove that he [or her] acted within his [or her] discretionary authority by showing [the] 'objective circumstances which would compel the conclusion that his [or her] actions were undertaken pursuant to the performance of his [or her] duties and within the scope of his authority.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)). At all times relevant to this issue, Charest asserts, maintains that Defendant Wynne usurped the performance of assigned duties as the "*special member during the 2005 Parole hearing*," and for such, has in fact acted outside the scope of his authority therefore such act(s) –omission(s) remain without discretionary authority in that limited capacity, as then specially appointed to assist Chairman S. Williams, others.

Only when a Defendant "[E]stablishes that he was acting within his discretionary authority, then and only then would the burden shift to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002), Charest maintains, although Defendant Wynne has failed to meet the applicable stricture, for the sake of argument Charest asserts that the Eleventh Amendment defense remains inapplicable to Charest's facts before this Court.    In order to decide if the plaintiff is required to meet the shifted burden, it will be necessary for the court to apply a two-part test. First the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Smith v. Siegelman*, 322 F.3d 1290, 1295 (11th Cir. 2003).

In the event the court finds that the allegations do state a constitutional violation, the court must go on to determine "whether the right was clearly established." Id. at 1295.

Since Charest's "suit" is in fact against specific named defendants and not against the "State" itself, nor did Charest seek a[ny] monetary relief, but only declaratory and

6

future injunctive relief the Eleventh Amendment proscriptions as applied to this instant case are not applicable to Charest's distinguishable §1983 claims.

Charest respectfully asserts, maintains that *Young supra*, and its progeny provide for prospective injunctive relief for ongoing violations of federal law, worthy of this Court's judicial scrutiny under the United Supreme Court's holding in *Wilkinson v. Dotson*, 544 U.S. 74, 161 L.Ed.2d 253, 125 S.Ct. 1242 (2005), *inter alia*.

In the present case, Charest's Complaint sought (i) a simply declaration that certain acts by Defendant Wynne, R. Longshore, V. Weatherly be ruled unconstitutional and unlawful as –applied through the *novelty* of *Wilkinson v. Dotson*, 544 U.S. at 74 (2005) and Charest asked this Court (ii) to enjoin Defendant Wynne's, R. Longshore's, V. Weatherly's future parole practices be in compliance with Federal standards applicable to states and for this Court to take remedial action to ensure that Defendants 1) S. Williams now superseded by 2) Defendant Bill Wynne, Jr., 3) V. Weatherly and 4) R. Longshore to fully comply with all such Federal laws in the future, as delegated by the *gateway* ruling of *Wilkinson*, supra.

As such, the *Young* exception applies therefore no rational basis remains for dismissal of said Defendants.          Accordingly, any relief afforded these three (3) Defendants based on the Eleventh Amendment should be denied. *See Ex Parte Young*, 209 U.S. at 159-160; *Sandoval v. Hagan*, 197 F.3d. 484, 492 (11th Cir. 1999); *Ocean v. Kearney*, 123 F. Supp.2d 618, 621 (S.D. Fla. 2000).

## B. **Defendants**:

§ 3.          With respects to Defendant –Bill Wynne Jr., as named in this Federal action –the Supreme Court has expressly recognized that the Eleventh Amendment is not limited in its application to suits against a state, as allegedly asserted in the "*Special Report By Bill*

*Wynne To Amended* Complaint," (July 2nd. 2008) answer -but rather that its application is to be determined by the essential nature and effect of the suit in question, thus Charest maintains the foregoing assertions, attestations through U.S. Supreme Court and, Eleventh Circuit holdings:

Although an earlier Supreme Court case took an opposite view, the following Supreme Court decisions have expressly recognized that the Federal Constitution's Eleventh Amendment is not limited in its application to suits against a state as a named defendant, but rather that its application should be determined by the essential nature and effect of the suit in question: "1) *Poindexter v. Greenhow* (1884) 114 U.S. 270, 29 L.Ed. 185, 5 S.Ct. 903; 2) *Pennoyer v. McConnaughy* (1891) 140 U.S. 1, 35 L.Ed. 363, 11 S.Ct. 699; 3) *Scheuer v. Rhodes* (1974) 416 U.S. 232, 40 L.Ed.2d 90, 94 S.Ct. 1683, 71 Ohio Ops 2d 474; and 4) *Ex parte Young*, (1908) 209 U.S. 123, 52 L.Ed. 714, 29 S.Ct. 441 as follows:

1.    **Suit(s) held not precluded by Eleventh Amendment**:

1).        "It was observed by the Supreme Court in *Poindexter v. Greenhow* [114 U.S. 270] -that the question whether a suit is within the prohibition of the Eleventh Amendment is not always determined by reference to the nominal parties on the record —the prohibition must be determined by a consideration of the nature of the case as presented on the record and that the Eleventh Amendment is to be substantially applied in furtherance of its intention, and not evaded by technical and trivial subtleties —as attempted by Defendant Wynne hereinafter, Charest requests that this Court apply the forgoing reasoning under the holdings of this Circuit's progenies.

The Supreme Court held, under the circumstances of the following cases, that the Federal Constitution's Eleventh Amendment did not preclude a federal action against state officials, in that the State was not a real or substantial party in interest in the action:

Also announced by the Supreme Court in *Poindexter, supra,* was an additional case which arose in a state court as-applied in the companion cases of *White v. Greenhow* (1885) 114 U.S. 307, 29 L.Ed. 199, 5 S.Ct. 923; and *Allen v. Baltimore & O. R. Co.* (1885) 114 U.S. 311, 29 L.Ed. 200, 5 S.Ct. 925 -both of which arose in the federal courts -it was held that <u>actions against state officials who had acted pursuant to a state statute which violated the Federal Constitution were not precluded by the Eleventh Amendment</u>. (Emphasis-added).        In all three cases, it was alleged that the statute, which provided that certain bond coupons would not be accepted by the state as a means of paying taxes, violated the Federal Constitution's contract clause (Art I, 10, cl. 1). Addressing the contention that the Eleventh Amendment barred such suits, the court noted that the suits (1) had not named the state as a party; (2) were not directly upon a contract between bondholders and the state; (3) had not been brought for the purpose of controlling the discretion of executive officers or administering funds actually in the public treasury; (4) were not attempts to compel officers of the state to do the acts which constituted the performance of a contract by the state; and (5) were not cases in which the state was a necessary party. The Supreme Court further stated that suits between individuals, unless the state was a party in a substantial sense, were untouched by the Eleventh Amendment, no matter how much the determination of such suits might accidentally and consequentially affect the interests of a state or the operation of its government. " *Id*.;

2).        "In *Pennoyer v. McConnaughy* [140 U.S. 1] -a case in which a citizen of one state brought an action in Federal Circuit Court against another state's board of land commissioners, which board had as members the state's governor, secretary of state, and treasurer, the Supreme Court, affirming the Circuit Court's judgment, held that such action was not a suit against the state within the meaning of the Eleventh Amendment. The state in which the citizen's land was located had enacted a statute, which authorized the board of land commissioners to cancel its certificates of sale with respect to parcels of land owned by the state. One of the canceled

certificates had been issued to a prior owner of the land held by the citizen at the time of the statute's enactment. In filing his Circuit Court action against the board of land commissioners, the citizen contended that such cancellation violated the Federal Constitution's contracts clause. Holding that the Eleventh Amendment did not bar such action, the court stated that it had to be borne in mind that the suit was not against the governor, secretary of state, and treasurer as such officers, but against them collectively as the board of land commissioners. Furthermore, continued the court, the citizen did not seek any affirmative relief against the state or any of its officers, nor did he seek to compel the state officers to do and perform any acts in connection with the subject matter of the controversy requisite to complete his title to the land.

Denying a county sheriff's petition for a writ of habeas corpus where the sheriff had been held in contempt by a Federal Circuit Court for refusing to turn over to a railroad company's receiver, who had been appointed by the Circuit Court, property upon which the sheriff had levied while it was in the hands of the receiver, the Supreme Court stated in *Re Tyler* (1893) 149 U.S. 164, 37 L.Ed. 689, 13 S.Ct. 785, that, even if the receiver's action to enjoin the sheriff from interfering with the property were regarded as a plenary bill in equity properly brought for the purpose of testing the legality of state tax which the sheriff was attempting to enforce when he levied upon the property, such action would not constitute a suit against the state in contravention of the Eleventh Amendment. A suit was not an action against the state within the meaning of the Eleventh Amendment, said the court, where the suit-whether it sought damages, injunctive relief, or the issuance of a writ of mandamus to enforce the performance of a purely ministerial legal duty-was brought against defendants who claimed to act as officers of the state and who, under color of an unconstitutional statute, injured or wrongfully held money or property unlawfully taken on behalf of the state." *Id.*;

3).        "In *Scheuer v. Rhodes* [416 U.S.232] -which involved a federal civil rights action against a state governor and other state officials, the

Supreme Court stated that it was well established that the Eleventh Amendment barred suits against the state only when it was the named party, when it was the party in fact. Because the Eleventh Amendment did not in all instances bar actions for damages against state officials charged with depriving a person of a federal right under color of state law, the Federal District Court below had acted prematurely in dismissing complaints, which had been brought by personal representatives of students who had been killed on the campus of a state-controlled university, in which damages were sought under 42 U.S.C.S. §1983 against the state governor, other state officials, and members of the state National Guard, where the personal representatives alleged facts that demonstrated that they were seeking to impose individual and personal liability on the named defendants for their alleged deprivation of the students' rights under color of state law. The court observed that (1) the Eleventh Amendment provided no shield for a state officer confronted by a claim that the officer had deprived another of a federal right under the color of state law, and (2) such an officer could thus be subjected in his person to the consequences of his individual conduct when he acted under a state law in a manner violative of the Federal Constitution." *Id.*;

a.    **Prospective payment or expenditure:**

i).    "The Federal Constitution's Eleventh Amendment does not preclude a federal court's imposition of monetary liability on a state in the form of a "prospective" payment or expenditure from state treasury funds for future or continuing conduct in violation of federal law, the Supreme Court has recognized." *Id.*;

ii).    "In *Milliken v. Bradley* (1977) 433 U.S. 267, 53 L.Ed.2d 745, 97 S.Ct. 2749, the Supreme Court, noting that it had previously recognized that a suit for money damages against a state was proper under the Eleventh Amendment to the extent that such action sought the payment of state funds as a necessary consequence of prospective compliance with a substantive federal-question determination, held that a Federal District Court's order in a school district desegregation

case, which order mandated that the state pay one-half of the additional future costs attributable to remedial programs directed to the educational components of reading, teacher training, testing, and counseling, did not violate the Eleventh Amendment. The court said that such order fit squarely with the prospective-compliance exception to a state's Eleventh Amendment immunity, which exception permitted federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury. The fact that the programs were compensatory in nature did not change the fact that such programs were part of a plan that operated prospectively to bring about the delayed benefits of a unitary school system, the court concluded." *Id.*;

iii).        "The court stated in *Hutto v. Finney* (1978) 437 U.S. 678, 57 L.Ed.2d 522, 98 S.Ct. 2565, reh. Den. 439 U.S. 1122, 59 L.Ed.2d 83, 99 S.Ct. 1035, that the line between retroactive monetary relief against the states-which was prohibited by the Eleventh Amendment-and prospective relief-which the Eleventh Amendment did not prohibit-should not be so rigid as to defeat the effective enforcement of prospective relief," (Emphasis-added), citing *Edelman v. Jordan*, [415 U.S. 651] as stated in *Kentucky v. Graham*: "that monetary relief is ancillary to injunctive relief is not barred by the Eleventh Amendment," and *Papasan v. Allain*, [478 U.S. 265] "the court stated that relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment, even though accompanied by a substantial ancillary effect on the state treasury." *Id.*;

iv).        "Vacating a Federal Court of Appeals judgment insofar as such judgment had affirmed a Federal District Court's dismissal of claims that a state had deprived some counties of the use and benefits of certain lands purportedly set aside for school use when granted to the state by the Federal Government, in violation of the equal

12

protection clause of the Federal Constitution's Fourteenth Amendment, the Supreme Court ruled in *Papasan v. Allain* (1986) 478 U.S. 265, 92 L.Ed.2d 209, 106 S.Ct. 2932, that such an alleged violation was precisely the type of continuing violation for which a remedy permissibly could be fashioned, notwithstanding the Eleventh Amendment. It was stated by the court that a remedy to eliminate a current disparity in the distribution of benefits of state-held assets-even where such remedy might require the expenditure of state funds-would not violate the Eleventh Amendment, since such a remedy would insure compliance in the future with a substantive federal-question determination, rather than bestow an award for accrued monetary liability." *Id.;*

4).     "In Ex parte Young [209 U.S. 123] -<u>it was held that the Eleventh Amendment did not prohibit the prosecution of an action in Federal Circuit Court against a state attorney general</u>, in which action stockholders of several railroad companies sought <u>to enjoin the attorney general from enforcing certain orders and acts of the state</u> railroad commission which allegedly violated the stockholders' rights under the Federal Constitution. The court said that the state was not a party to the action simply because the state railroad commission was a party," (Emphasis –added), citing as sufficient authority for, not only the above, and Charest's current proposition are 1) *Smyth v. Ames*, [169 U.S. 466] "enjoining state officials from enforcing a state statute which violated the Federal Constitution, that a suit against individuals for the purpose of preventing them as officers of the state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff was not a suit against the state within the meaning of the Eleventh Amendment," and 2) *Prout v. Starr*, [188 U.S. 537] "granting injunctive relief –an action against the members of the state board of transportation, which action had been brought for the purpose of preventing the enforcement of the a state statute was invalid under the Federal Constitution –was not a suit against the state within the meaning of the Eleventh Amendment." *Id.*

13

§ 4.        Notwithstanding the Federal Constitutional's Eleventh Amendment, corporations or _agencies that have been created by a state could be sued in federal court_. Therefore Charest maintains and assert that the state is not the "entire party" in the action, the Supreme Court ruled in _Bank of United States v Planters' Bank of Georgia_ (1824) 22 U.S. 904, 6 L.Ed. 244, that:

> "The Eleventh Amendment did not preclude a Federal Circuit Court from asserting jurisdiction over an action brought by a federally chartered bank against a state bank, with respect to which action the state itself held a partial interest as a corporator. The court, noting that a suit against the state bank was no more a suit against the state than against any other individual corporator of the bank, said that the state, by giving the bank the capacity to sue and be sued, had voluntarily stripped itself of its sovereign character and waived all its sovereign privileges. It was a sound principle, observed the court, that when a government became a partner in any trading company, that government divested itself-so far as concerned the transactions of such company-of its sovereign character and took the character of a private citizen.
>
> Reversing a Federal Court of Appeals judgment, insofar as it had held that an agency created pursuant to a compact between two states was protected by sovereign immunity under the Eleventh Amendment, the Supreme Court held in _Lake Country Estates, Inc. v Tahoe Regional Planning Agency_ (1979) 440 U.S. 391, 59 L.Ed.2d 401, 99 S.Ct. 1171, that the agency could not claim Eleventh Amendment immunity. The court pointed out that the protection afforded by the Eleventh Amendment was available only to "one of the United States." Although it was true, said the court, that agencies exercising state power could invoke the Eleventh Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the state itself, the Eleventh Amendment did not afford protection to political subdivisions such as counties and municipalities, even though such

entities exercise a "slice" of state power. If an interstate compact disclosed that the compacting states created an agency comparable to a county or municipality, which had no Eleventh Amendment immunity, the court continued, the Amendment should not be construed to immunize such an entity. According to the court, unless there is good reason to believe that the states structured the agency to enable it to enjoy the special constitutional protection of the states themselves, and that Congress concurred in that purpose, there appeared to be no justification for reading additional meaning into the limited language of the Eleventh Amendment. In the case at hand, the court emphasized, both of the states involved had disclaimed any intent to confer immunity on the agency." *Id.*

Although the Alabama Board of Pardon & Paroles remains in fact an agency created by state statute, nevertheless, in accordance with the cases cited above these individual named Defendants are not entitled to immunity under said asserted doctrine.

**2.    State Officers or Agents:**

1).    In viewing, the Supreme Court further held "that the State must be the real or substantial party interest: citing the following Supreme Court cases explicitly, that support —in order for the state's immunity under the Federal Constitution's Eleventh Amendment to be invoked in a suit against a[ny] state official, the state must be the real or substantial parting in interest in the suit. In *Pennoyer v. McConnaughy* [140 U.S. 1] -the court observed that such principle application stated, two classes of cases existed, the first class, said the court, consisted of cases against a state within the meaning of the Eleventh Amendment, in which cases suit was brought against the officers of a state as representing the state's action and liability, thus making the state, although not a party to the record, the real party against which the judgment would operate so as to compel it specifically to perform its contracts. The other class of cases, the court continued, were those in which suit was brought against defendants who, while claiming to act as officers of the state and under color of an

unconstitutional statute, committed acts of wrong and injury to the rights and property of the plaintiff which had been acquired under a contract with the state. As to this class, the court said that such a suit was not within the meaning of the Eleventh Amendment as an action against a state, where the suit was brought either (1) to recover money or property in the hands of such defendants which they had unlawfully taken in behalf of the state, (2) for compensation in damages or, in a case where the remedy at law was inadequate, for an injunction to prevent wrong and injury, or (3) for mandamus to enforce the performance of legal duties which are purely ministerial." *Id.*

Charest asserts for the most part Defendant Wynne is not duly entitled to the immunity requested in his "*Special Report.*"    Furthermore it was held in *Hopkins v. Clemson Agricultural College* (1911) 221 U.S. 636, 55 L.Ed. 890, 31 S.Ct. 654, that, the court recognized that the Eleventh Amendment was not intended to afford freedom from liability in any case, as herein, where an officer, under color of office, injures one of the state's citizens.

In *Smyth v. Ames* (1898) 169 U.S. 466, 42 L.Ed. 819, 18 S.Ct. 418, modified on other grounds 171 U.S. 361, 43 L.Ed. 197, 18 S.Ct. 888, the Supreme Court, affirming Federal Circuit Court decrees enjoining state officials from enforcing a state statute which violated the Federal Constitution, stated that a suit against individuals for the purpose of preventing them as officers of the state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff was not a suit against the state within the meaning of the Eleventh Amendment. Citing *Smyth*, *supra*, as sufficient authority for the proposition, the court held in *Prout v Starr* (1903) 188 U.S. 537, 47 L.Ed. 584, 23 S.Ct. 398, in affirming a Federal Circuit Court decree granting injunctive relief, that an action against the members of a state board of transportation, which action had been brought for the purpose

16

of preventing the enforcement of a state statute which fixed minimum railroad rates on the ground that the statute was invalid under the Federal Constitution and federal statutes, was not a suit against the state within the meaning of the Eleventh Amendment.

In Young, [209 U.S. 123] the Supreme Court stated that there was ample justification in its Eleventh Amendment jurisprudence for the assertion that individuals who, as officers of the state, were clothed with some duty in regard to the enforcement of the laws of the state, and who threatened to commence either civil or criminal proceedings to enforce an unconstitutional statute, could be enjoined by a federal court of equity from such conduct.          Accordingly, the Supreme Court held that the Eleventh Amendment did not prohibit the prosecution of an action in Federal Circuit Court against a state attorney general, in which action stockholders of several railroad companies sought to enjoin the attorney general from enforcing certain orders and acts of the state railroad commission which allegedly violated the stockholders' rights under the Federal Constitution's Fourteenth Amendment. The attorney general had objected to the jurisdiction of the Circuit Court over him, on the grounds that the action against him was, in effect, one against the state, in violation of the Eleventh Amendment, and that the issuance of the injunction illegally prohibited the state's enforcement of obedience to its statutes. Rejecting such contention, the court said that, if the acts which the attorney general sought to enforce violated the Constitution, the attorney general came into conflict with the superior authority of the Constitution in proceeding under such acts, and in such a case he was stripped of his official or representative character and was subjected in his person to the consequences of his individual conduct. The court therefore dismissed the attorney general's petition for a writ of habeas corpus, which the attorney general had filed

after the Circuit Court, had committed him to custody for his contempt in violating the

Circuit Court's injunction order. Immunity is not absolute in this instant action.

DEFENDANT Wynne's *Due Process Defense* stated at page 4 –5 that:

> "Wynne denies violating Plaintiff's due process rights.
> Alabama law does not establish a liberty interest in the desire
> to be released on parole. That desire is not protected by due
> process, . . . The Constitution does not require a *"fair"* process
> to decided whether to grant discretionary parole, . . . Charest
> simply cannot state a claim for procedural due process."

> "Charest also seeks to present a substantive due process claim
> under *Monroe v. Thigpen* to make out such a claim, he must
> identify some information that is in fact false, that the Board
> knew to be false, and that the Board relied upon in denying
> parole. . ." *Id*.

§ 5.        First, it must be pointed out to this Court, Charest has never argued, nor

presented a[ny] claim under Alabama law, as to hav[ing a liberty interest to Parole],

Defendant Wynne, has likened Defendants Williams, Longshore and Weatherly misapplied

the Supreme Court's decision under *Wilkinson*, progeny as applied to Charest's unique

challenge herein, that is, that: "Alabama's Parole Board *procedures, policies,* are in direct

conflict –constitutionally speaking under *Wilkinson*."

Charest maintains this §1983 action remains his sole remedy to right Defendants

wrong(s) under Federal standards yet to be clearly addressed under the auspice invoked

above, herein; thus Charest requests for an in toto review to appropriately determine if in

fact the Defendants post -enactments of said "Articles," remain an *ex post facto* violation

when compared to pre –2002 and 2004 guidelines provided Charest, and others similarly

situated –under juridical measures of the protective umbrella envisioned beneath the Due

Process Clause as well as violating Charest's Equal Protection rights enjoined him through

the Fourteenth and Fifth Amendments within the Federal Constitution, see the Parole

Board's pre-guidelines and forms, attached at *"Charest's Response / Reply To Defendant*

18

*Williams, Weatherly's And Longshore's Unsupported Answer Filed 1/10/08"* coupled with Charest's Exhibits, supporting a direct contradiction to Defendant Wynne's unsupported Special *Report at pages four (4) through Five (5), inter alia.*

§ 6.        Charest replies and relies upon Alabama law as this Court well knows, that "the right to parole is a privilege granted by the people of Alabama to those committed to [y]our penal institutions as punishment for crimes." *Andrus v. Lambert,* 424 So.2d 5, 9 (Ala.Cr.App. 1982); *Holley v. State,* 397 So.2d 211, 216 (Ala.Crim.App.), cert. Denied, 397 So.2d 217 (Ala. 1981).        Thus obtaining release through parole, like obtaining a pardon, is wholly contingent upon either the grace of the detaining authority or some affirmative statutory entitlement. *United States v. Chagra,* 669 F.2d 241, 264 (5th. 1982), and although while "no constitutional or inherent right of a convicted person to be conditionally released prior to the expiration of a valid sentence exists, *Greenholtz v. Nebraska,* [442 U.S. 1], a prisoner, even like Charest **"has the right to be properly considered for parole**." *Christopher v. U.S. Board of Parole,* 589 F.2d 924 (7th. Cir. 1978); *Wallace v. Turner,* 525 F.Supp. 1072 (S.D. Fla. 1981)(emphasis-added).

Paroling authorities **must** comply with constitutional requirements and may not determine parole eligibility [or consideration] on improper grounds. *Wallace v. Turner,* *supra.,* parole cannot be denied on false, insufficient, or capricious reasons. *Christopher,* *supra., Tedder v. Alabama Bd. of Pardon & Paroles,* 677 So.2d 1261 (Ala.Crim.App. 1996), see also *Tucker v. Alabama Bd. of Pardon & Paroles,* 781 So.2d 358 (Ala.Crim.App. 2000).

Counsel for Defendants remains wholly wrong, as previously made mention of by Charest in Document # 41, dated 2/06/08 at page 2 to-wit: "Charest never once argued, nor attempted to present to this Court as an inmate under Alabama law, that he was **deprived of liberty without due process** . . ." Id.  Such defensive tactic by Counselor Sirmon

19

remains to be nothing other than a sham /shotgun style pleading cause to be stricken, or viewed as a nullity in and of itself –its not Charest's claim.

It seems that Counselor Sirmon attempts to mislead this Court's juridical eye as did Counselor H. Davis with Defendants 1) Weatherly and 2) Longshore, however prayerfully this Court will not travel that "*beaten trail*" so often blazed by previous pro –se litigants inapposite to Charest's current fight for truth –justice hereinafter.

Nowhere can this Court, as mentioned by counsel "find in Charest's three (3) succinct claims," that Charest –complained of, ensuing, a denial of parole down a *liberty interest* vein whether under the due process clause or the equal protection clause –to the extent that *liberty* was challenged, Counsel is simply being disingenuous to this Court and attempting to steer Charest's dispositive first impression issue to lead said parties down a well beaten path Charest can't win if he, or this Court would entertain, or adjudicate the real claims beneath the liberty interest vein.

Counsel partially admitted, openly to this Court and specifically Plaintiff, that "*the Constitution does not require that Alabama's discretionary parole consideration process be fair* . . ." Id. at Wynne's Special Report p. 4 ¶2. If such a statement is true that the Board's process does not have to be fair then not only has counsel openly admitted albeit partially one of Charest's elements for relief sought –this Court too can likewise juridically speaking "*take judicial notice of said* fact" and sufficiently move towards taking a closer look at the Board's process of being at least "*fair*" when, how it reviews Alabama inmates as-applied to Charest's parole *eligibility* or *consideration* needing to be brought into the 21st. Century –which Charest strenuously challenges the Boards flagrant process, however given Counsel assertion that "fairness has no place in Alabama's Constitutional parole consideration process," the same likened deprivation was most recently overturned in

*Wilkinson v. Dotson*, 544 U.S. at 74 (2005) (challenging "*prospectively, the unfair parole policies*" ) –the due process complaint was quite unique, because as herein –it too, did not challenge the way the Board exercised its discretion; rather it alleged as Charest, that the Board was actually not exercising its discretion at all.

Charest's cause of action follows the same line of legal reasoning, that the United States Supreme Court found interesting enough to consider and changed Ohio's Parole Board procedures indistinguishable to the facts and circumstances as a whole which arguably demonstrate Alabama's Parole Board procedures are illegal at best –the statistical trends, and recurring pretextual "*reasons*" for denials and common threads of reliance solely upon the crime [versus Alabama's 640-X guidelines inclusive to title §15-22-20 through §15-22-40] are not in accord with statutory criteria, a single denial "*does not a policy make*," it takes a group attack as requested herein your Honor to gain the juridical eye of Federal Court comity in road with *Wilkinson v. Dotson*, supra.

The basic tenet established above now graciously admitted by the Defendants has a fundamental substantive underpinning to Charest's three colorable claims, grounds for immediate intervention and plenary review by this Court under *Wilkinson*, *supra*.

Charest respectfully requests that this Court give no attention to Defendant Wynne's Special Report allegation at page four (4) ¶ 2 –based upon "*any liberty interest claim*" it being a moot defense –because their currently remains "NO-CLAIM for a[ny] liberty interest issue before this Court by Charest.    Defendant Wynne is not entitled to change, alter the claims before this Court, Defendant Wynne quoted Charest's succinct claims in his Special Report at page two (2) but somehow when the time came to "facially argue" the claims, at page four (4) under "Due Process" heading –the claims magically "shape shifted"

21

right before the Court, and Charest into: "*Alabama law does not establish a liberty interest in the desire to be released on parole.*" Id.

First, Charest maintains his claims remain colorable pled before this Court, that is, Charest's 12/2005 Parole denial was the direct result of "*unconstitutional*" policies resulting in a violation of a Fourteenth Amendment proscription invoked upon States through the United States Constitution and challenged in Federal Court under the auspice of *Wilkinson*, therefore in accordance with said *gateway* holding Charest is entitled to an adjudication by this Court under §1983 strictures as applied to *Wilkinson's* holding under the doctrine of *stare decisis*.

Secondly, Charest replies to Defendant Wynne's allegation concerning the false information –relied upon in denying parole consideration, Charest maintains that "erroneous –false information was spoken, asserted by one Maria LeBreton a person contacted by the Defendants outside Alabama's State law notification(s) ("640-X-2-.06 [notices of pending parole consideration, Act #83-750]; 640-X-2-.07 [protests]; 640-X-3-.05 [Victim Request of Waiver of Notice]"), whom worked in concert –collusion with either M. Shehane at VOCAL or the Attorney General T. Kings Office -at the 2005 parole hearing, whereas said parties absent any first hand knowledge, either through contacts, such as (i) visits, (ii) phone conversation, or (iii) letters, stated that "*Charest had not changed over the years of imprisonment*," id. at Charest §1983 Complaint Claim 2.                    In *Monroe v. Thigpen*, 932 F.2d 1437, 1442 (11th. Cir. 1991) -the Court of Appeals for the Eleventh Circuit stated:

> "It is true that the Alabama parole statute is framed in discretionary terms and therefore does not confer a liberty interest in parole. Ala.Code §15-22-26 (1975); *Thomas*, 691 F.2d at 489. Nevertheless, this discretion is not unlimited. A parole board may not engage in 'flagrant or unauthorized action.' *Thomas*, 691 F.2d at 489. Section §15-22-26 cannot be read as granting the Board the discretion to **rely**

**on the false information in determining whether to grant parole**. Therefore, by relying on the false information in Monroe's file the Board exceeded its authority under §15-22-26 and treated Monroe arbitrarily and capriciously in violation of due process. *Thomas*, 691 F.2d at 489." *Id*.

(Emphasis-added).                    Charest relies on the progeny of *Thomas v. Sellers*, 691 F.2d [487], 489 (11th Cir. 1982), *Monroe*, 932 F.2d at 1442, and other cases along said same holding, Charest made a colorable claim, that "*false information*," was used, considered by the Board in 2005, thus confirming he was effectively deprived of due process based upon said false information asserted on 12/2005 by Maria LeBreton which both (i) caused the injury and (ii) remains the proximate cause for the denial to a fair parole consideration –therefore Defendant Wynne relying on such "*false information*," exceeded his lawful authority under §15-22-26, Ala.Code, 1975 and treated Charest both arbitrarily and capriciously in violation of due process. *See Monroe*, *supra*, see Charest's attached Affidavit –supporting said "*false information*," above.

To analyze Charest's procedural due process claim, effectively, under the vein asserted under the plenary review of *Wilkinson*, *supra*, this Court must first determine whether a constitutional interest exists in the context of which the United States Supreme Court holds that "retroactive procedural changes in the parole board process is prohibited as-applied to [one's] sentence, whereas it creates a significant risk of increasing his punishment," *see Harris v. Hammonds*, 217 F.3d 1346, 1347 (11th. Cir. 2000)(per curiam)(quoting *Garner v. Jones*, 529 U.S. 244, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000). Simply put, Charest asserts, that "[a] person suffering legal wrong because of a an agency actions, or is adversely affected or aggrieved by an agency action within the meaning of a relevant statute, is entitled to judicial review." *See, e.g., St. Cyr*, 121 S.Ct. at 2285 –86.

Charest was entitled too, under the Constitution –for the Board Defendants to "have not relied on said false information -statement made by Maria LeBreton –thereby denying him a fair parole consideration in 2005." *See Tefel,* 180 F.3d at 1229 ("the necessary first step in evaluating any procedural due-process claim is determining whether a constitutionally protected interest has been implicated.") Following such a finding, the Court must access the extent of process due. *See Haitian Refugee Center,* 676 F.2d at 1037 ("once we find that a protected interest is implicated, the question remains what process is due.")(quoting Morrissey v. Brewer, 408 U.S. 471, 481, 33 L.Ed.2d 484, 92 S.Ct. 2593 (1972)).

The procedural component of the Due Process Clause of the Fifth Amendment protects against the deprivation Charest suffered, i.e., *"false information relied upon,"* during, the special board's parole consideration in December 2005. Thus, Charest is protected by the Constitution –forbidding Defendant Wynne from relying on such perjured attestations given by Maria LeBreton, alongside M. Shehane from Vocal. The Due Process Clause: (1) the right to petition the government and have that petition fairly adjudged "at a meaningful time and in a meaningful manner." <u>Haitian,</u> (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 14 L.Ed.2d 62, 85 S.Ct. 1187 (1965)).

As explained by Judge Friendly, among the most attributes of a fair hearing are: (1) notice of the proposed action and grounds on which it is asserted; (2) the right to know the evidence presented against the individual; (3) a decision based solely on the evidence presented; (4) a proceeding open to the public. *See Henry J. Friendly,* Some Kind of Hearing, 123 U. Pa. L. Rev. 1267, 1275 (1975), *see also Mathews v. Eldridge,* 424 U.S. at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.")(quoting Joint

Anti-Fascist Committee v. McGrath, 341 U.S. 123, 171-72, 95 L.Ed. 817, 71 S.Ct. 624 (1951)(Frankfurter, J., concurring)).

§ 7.        With respects to Charest's First Ground in the §1983 Complaint –Charest continues to maintain that post 2002 and 2004 amended *"procedural parole consideration guidelines"* affected Charest's December 2005 parole review violating the Federal Constitution –whereas Charest sought, afterwards both *"prospective declaratory and injunctive relief,"* challenging Defendant's retroactive and constitutionality of Alabama's unfair and discriminatory parole *"eligibility"* and *"considerations"* resulting in rendering invalid Alabama's procedures as held unconstitutional in *Wilkinson v. Dotson,* [544 U.S. 74] 2005; whereas Charest requests that this Court "take judicial notice of:"

> First, (The U.S. District Court case S.D.N.Y. a §1983 suit challenging New York's *sub rosa* blanket parole denial policy. See *Graziano v. Pataki,* 2006 WL 2023082) –citing *Wilkinson v. Dotson,* progeny;
>
> Second, (The U.S. District Court case E.D. Mich., for the Southern Division, held that cumulative changes to parole eligibility regulations for Michigan's Life –sentenced prisoners violated the U.S. Constitution's ban on *ex post facto* laws. See *Foster Bey v. Rubitschum,* Case No# 2:05-CV-71318-MOB-VMM October 23, 2007) –citing *Wilkinson v. Dotson,* progeny;
>
> Third, (The U.S. District Court case M.D. Pa. for the Middle District of Pennsylvania held that its 1997 law created a *"significant risk"* of increasing life-prisoners' punishment in violation of the *ex post facto* clause. See *Penn. Prison Society v. Rendall,* Case No# 1:97-CV-01731-ARC March 13, 2006);
>
> Fourth, (Two Ohio prisoners –challenged state's parole procedures, held permitted to bring actions under 42 USCS §1983 in the U.S. District Court for the Northern District of Ohio –claiming the state's parole procedures violated the Federal Constitution. See 329 F.3d

463 (2003 FED App. 147P) remanded by United States Supreme Court in *Wilkinson v. Dotson*, 544 U.S. 74 (2005).

For the sake of brevity, and concern towards being verbose Charest requests that this Court "take judicial notice of its own records," under Rule 201(d), Fed.R.Evid., to this instant traverse, as ordered by this Court on July 3rd. *2008*, see Charest's "*4/15/08 Affidavit with it's attached Exhibits 1 through 14*" adopted hereinafter as same therein, whereas throughout this reply Charest will in fact make direct references to said recorded Exhibits already filed, in the record proper to refute Wynne's Special Report.

When Charest was convicted / sentenced in 1994 Alabama's guidelines in effect, then, referred to hereinafter, marked and exhibited heretofore as Charest's **Exhibit-1,** filed along with Charest's "*Response / Reply To Defendants Williams, Weatherly, and Longshore's Unsupported Answer Filed 1/10/08*," which were filed /entered into the record on April 15th. 2008 -entitled Alabama's Administrative Codes 1) 640-X-2.01 −2.15 (Board Action in Granting, Denial and Supervision of Parole . . . Rights, Remissions of Fines and Forfeitures, and Investigations and Supervision of Probationers;" and 2) 640-X-3-01 −3-.11 (Forms and Instructions used by the Board of Pardon and Paroles in Granting, Denial and Supervision of Paroles, Pardons, . . . and Investigations and Supervision . . . applicable to the Public).

Charest avers that post −2002 and 2004 Board rules, guidelines when applied to Charest's pre −2002 and 2004 sentence as a Lifer, acted to effectively *increase* his punishment in violation of *Ex Post Facto* and *Due process Clause of the United States Constitution*, see Charest's **Ground Three** at §1983 COMPLAINT page 3, October 19th, 2007.        The challenged rules, regulations and or classified "guidelines now in effect," i.e., "Articles" affect Charest's former rights of:

26

"1)    <u>Parole review of every three (3) years under Alabama's</u> <u>Administrative Code 640-X-2-.02</u> (Scheduling Cases for Parole Consideration) at subsection (8) –whereas, said pre –2002 and 2004 guideline stated: "A parole calendar date may be changed by order of Board . . . When an inmate is denied parole, the Board will determine when his case is to be reset but **in no event shall it be reset for more than three (3) years from the date of denial**." Id. at *"Exhibit-1 dated 4/15/08 Affidavit / Exhibits 1 through 14"*;

"2).    <u>Pre-parole</u> **personal interview with prisoners** <u>being</u> <u>considered for parole will be conducted by an agent of the Board who</u> <u>will then submit a</u> **written report to the Board of his [her]** **findings and evaluations**," cited in 640-X-2-.03. Id. at *"Exhibit-1 dated 4/15/08 Affidavit / Exhibits 1 through 14"*;

"3)    <u>A Parole review worksheet</u> **shall** <u>be completed in each case by</u> <u>the parole officer, immediately after he /she completes the</u> <u>investigation of a case. This worksheet is reviewed by a senior staff</u> <u>officer in the Central Office for consistency and appropriateness and</u> <u>for a final evaluation.</u>" See "Charest's **Exhibit-3**)(Parole Review Worksheet)(PBF 118 rev. 4-86), cited in 640-X-3-.02. *Id. dated 4/15/08 Affidavit / Exhibits 1 through 14"*;

"4)    <u>Basic criteria for pre -parole inmates interviews</u> [under Alabama's Administrative Code 640-X-2-.03 at *"Charest's Exhibit-1, dated 4/15/08"* –<u>inclusive to a subsequent written reason for the</u> <u>Board's subsequent denial under Alabama's Administrative Code</u> <u>640-X-3-.04</u> (Interview / File Review Worksheet) which should suffice a Federal mandated protective stricture, granting either:
"(a)    **Reason Favoring Parole** or
"(b)    **Reasons Favoring Denial**," *see also* **"Charest's Exhibit-4)** *Id. dated 4/15/08 Affidavit / Exhibits 1 through 14*.

(Emphasis-added).                    Absent this form, first being produced either to

Charest by *DISCOVERY;* or in fact by ORDER of this Court *sua sponte,* for its in camera

review [for compliance with the 640-X-3-.04 strictures] applicable to Charest, the overall

commingled injuries will continue, not only depriving Charest in the future, but others, of

their right to know; whereas part of Charest's claim is that Defendant Wynne failed to

utilize said form, governed by the 640 regulations, but moreover, especially inapposite with

Legislative interpretations of §15-22-20(j)(k), Code of Alabama, 1975 "mandates," in that

Defendant S. Williams was not statutorily present during the 2005 decision making procedure –violating statutory strictures,    Defendant S. Williams' "*physical absence*" during the 12/2005 proceedings, as the chairperson, now mandates a new parole consideration, whereas the language utilized therein, states "This form is used by the board when it is considering an inmate for parole. It has a checklist showing the reasons for favoring parole and the reasons for denial of parole and the reasons for not resetting for parole consideration." **Id**. No comparison can ever effectuate federal comity of Charest's claim against said named –specific Defendants, absent the above anomaly being adequately resolved by this Court's learned juridical eye reviewing said Parole documents.

§ 9.        Most importantly for plenary review is Charest's **Exhibit-10 at:** "*Charest's 4/15/08 Affidavit / Exhibits 1 through 14,* predicating only two (2) signatures, that of the Amended Defendant -Bill Wynne, and that of –what appears to be a McGriff [?]; nevertheless the parole board Defendants 2005 "Action form" which in fact reveals the arbitrary denial of Charest's parole consideration, when reviewed –compared with "Charest's Exhibit-9, the 640-X-3-.06 form that existed when Charest was convicted / sentenced" as alleged in said instant §1983 complaint is sufficient to birth relief, inapposite to Wynne's allegation to the contrary, moreover interesting is Alabama's language of §15-22-20(j)(k) to-wit:

> "j).    During the term of *the special members of the board **shall sit in two panels of three for the purpose of conducting hearings and making determinations concerning paroles*** . . . Membership on *each panel **shall*** be designated by the chairman of the board [then Sidney Williams] from among the remaining regular and special members [herein Wynne] of the board as the chairman determines from time to time shall be necessary to hear all pending matters in an expeditious manner. ***The chairman of the board shall serve as an alternative with members of either panel*** and shall re-designate panel membership as necessary to carry out the hearing duties of the board." *Id*.;

28

"k).    When ***the board sits in panels of three members as herein authorized, each panel shall    act in the same manner and under the same authority as the full board***. . . . Decisions of ***each panel shall constitute a decision of the board. All procedures of the board relating to the conduct of the hearings shall apply to hearings before either panel of the board***." *Id*.

(Emphasis-added)(Act 2003 –415, p. 1205, § 1).    Duly noted in the above styled language under statutory construction is the word "**shall**," and Charest points out several things worthy of reversible error herein, reflecting once again to Exhibit-10 at: "*Charest's 4/15/08 Affidavit / Exhibits 1 through 14*," the "Board's 2005 Action," predicating only the existence of two (2) signatures –dated 12/06/05 inapposite to the §15-22-20(j) to-wit: "*the special members of the board **shall** sit in two panels **of three for the purpose of conducting hearings and making determinations concerning paroles** . . .*" **Id**.

Charest had only been statutorily provided two special members thus the 2005 proceeding remains moot, absent a third member –either sitting in, or alongside Defendants Wynne and McGriff thereby making Charest's parole consideration a complete nullity to be exact and thus, cause for immediate re-scheduling for another legislative parole board hearing –absent the challenged claims herein -hindering, obstructing or otherwise inferring with another adequate parole hearing.

As interesting as such remains, Defendants Weatherly's and Longshore's Exhibit-D, at pp. 9 –10 under "Article Six" (Board of Pardons, Paroles) at section thirteen (13), states in no uncertain terms, that:

"13.    If only two [2] members of the Board are present to hear a case requiring unanimous approval, the Board may pass over that case to hear other cases on the docket [which it did not do with Charest] **pending arrival of the remaining member [Chairperson Williams] the third member does not return that day, the Board may offer those present an opportunity to express their views, and the two [2] members present may ask questions, but the two [2] members shall not**

29

**deliberate in the absence of the third member**. The case **shall** be continued to a date certain, which **shall** be announced in open public meeting, **at which time the entire board will take action**. Only one continuance **shall** be scheduled. In the event that the Board is unable to decide the case on the date specified, the case **shall** be rescheduled for further consideration as early as is practicable, consistent with statutory requirements." **Id**.

(Emphasis-added).                Evidentiary documentation exists that these two (2) special parole board members "**disclosed during discovery**" remain "principally" responsible for violating Charest's statutory parole board "*consideration*" on 12/06/05 (*Charest's Exh-10 dated 4/15/08*), now ripe for judicial intervention and cause for remand consistent with Alabama's legislative language; both 640-X-2 and −3 were effectively abridged congruent to a normal reading of §§15-22-20(j)(k), Code of Alabama, 1975.

§ 10.        Furthermore, Charest maintains that his aforementioned / submitted evidentiary documents marked −entered to refute Defendant Wynne's Special Report, see "*Charest's 4/15/08 Affidavit / **Exhibit-11[a]**,*" that of Quentin Gales, #174529 docketed for parole review September 2001, whereas all three (3) parole board members signed, and completely filled out the "Action form" pursuant to §§15-22-20(J)(k) mandates, as presented / mentioned by "*Charest's 4/15/08 Affidavit / Exhibit 9*," which is the (640-X-3-.06) document; another review of Gales case −after returning to imprisonment from Parole is his parole hearing day, date of May 2006 marked -entered as "*Charest's 4/15/08 Affidavit / **Exhibit-11[b]**,*" again all three (3) parole board members being statutorily involved pursuant to §§15-22-20(J)(k) strictures -participated in Gales review [inapposite to Charest's review] -albeit though this time (5/08/06) the Board denied Gales parole, resetting his next review to May 2007 (a one year set off); then again, is "*Charest's 4/15/08 Affidavit / **Exhibit-11[c]**,*" dated May 22, 2007 all three (3) members sign in accord with §§15-22-20(j)(k) strictures, thereinafter resetting Gales until May 2008. Id.

30

§ 11.        Another marked, entered document is "*Charest's 4/15/08 Affidavit /*
***Exhibit-12***," that of inmate Willie Lee White, #140147 docketed for parole review on
September 8th, 2005 but not scene until March 7th. 2007, all three (3) members sign and
date –in accord with §§15-22-20(j)(k) strictures, thereby setting off White three (3)
additional years until his next review, under the 640-X guidelines!

§ 12.        Another marked -entered document is "*Charest's 4/15/08 Affidavit /*
***Exhibit-13***," that of inmate Bernies Burnett, Jr., #132146 docketed for parole review on
October 2006, but not scene until February 20, 2007 again all three (3) parole board
members 1) S. Williams, 2) V. Weatherly and 3) R. Longshore sign, date his denial for
parole, setting off Burnett until February 2012 (a five year set off) but this time the parole
board members utilize the Board's "*Articles*" increasing Burnett's next review –inapposite
to others similarly situated such as Charest, White and Gales.

        The above few -cited inmates, along with others will prayerfully surface during
*DISCOVERY* –in addition to those exhibited / argued below, that Charest extracts from
Alabama's 2008 Sentencing Commission whereupon Charest references this Court to
review other similarly situated inmates, predicating an evidentiary dissimilarity in the way
Charest is being treated for the most part in violation of Equal Protection strictures.

DEFENDANT Wynne's *Equal Protection Defense* stated at page 5 that:

> "Wynne denies violating Plaintiff's equal protection rights . . .
> The Complaint alleges that Charest . . . is treated differently
> than prisoners convicted of less serious crimes . . ." ;

> ". . .

> "The Constitution does not prohibit dissimilar treatment of
> dissimilar situated persons." *Id*.

§ 13.        First and foremost –Charest points out to this Court, Counselor Sirmon is
twisting or attempting to "*prejudice this Court's mind*," by making unnecessary allegations

31

/ assertions referencing what a state court convicted Charest of, which currently has no direct relevance to the subject matter at hand, which does nothing more than undermine his ability to litigate the "*truth of the issues before the Court*," per se cause to question his alterative means or perhaps his integrity amongst jurists, assuming arguendo Counselor Sirmon operates under such ethical vein to begin with –cause for Charest to request, that this Court "*strike said superfluous allegations 'serving life sentences for rape first degree and sodomy first.*'" **Id**.

For the sake of preserving objections respective to replying Charest will attempt to respond accordingly to Defendant Wynne's avoidance of the applicable "*Equal Protection*" holdings, as follows:

The **equal protection clause of the Fourteenth Amendment** requires that similarly situated people be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985). While most equal-protection cases allege discrimination on the basis of suspect classifications such as race, sex, or national origin, the **equal protection clause** more generally "protects citizens from arbitrary or irrational state action." *Batra v. Board of Regents of the Univ. of Nebraska*, 79 F.3d 717, 721 (8th Cir. 1996). Even when a legislative enactment does not discriminate on its face, if it is applied in a discriminatory manner, as herein, it can violate the guarantee of equal protection.     Here, Charest alleges that the Board's laws or regulations are facially discriminatory. It is clear that Defendant Wynne is applying the law in a discriminatory manner, *see, e.g., Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) ("It is well settled that unequal application of a facially neutral statute may violate the **Equal Protection Clause**."), or he is claiming that the seemingly neutral law was passed for discriminatory reasons and although such as it is -has a disparate impact on a certain

32

group ("sex offenders") such that its enforcement is somehow constitutional, *see, e.g.,* *Hunter v. Underwood,* 471 U.S. 222, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985) (holding that facially neutral Alabama law adopted in order to discriminate against blacks and which continued to have a disparate impact against blacks violated the **equal protection clause**).

Charest asserts that the challenged Board actions are motivated by their intent to discriminate against "sex offenders" –establishing an **equal protection clause** violation, motivated by an intent to discriminate against certain Class A felons. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S. Ct. 555, 563, 50 L. Ed. 2d 450 (1977); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir. 1993).

**A.    The Theory of Equal Protection and
         Equal Protection Clause:**

The Equal Protection Clause requires that the government treat similarly situated individuals in a like manner. U.S. Const. Amend. XIV, 1; *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As a general rule, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." <u>Cleburne</u>, 473 U.S. at 440. When "social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude." **Id.** This general rule gives way, however, "when the statute classifies by [gender,] race, alienage, or national origin," and because such factors "are seldom relevant to the achievement of any legitimate state interest," such laws are subject "to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." **Id.** Thus, if legislation classifies people in such a way that they receive different treatment under the law, the degree of scrutiny the court applies to the legislation depends

on the basis for the classification. *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1337 (11th. Cir. 2002). Where a fundamental right or a suspect class is involved, the court reviews the classification with <u>strict scrutiny</u>. **Id.** On the other hand, "[i]f an ordinance does not infringe upon a fundamental right or target a protected class, equal protection claims relating to it are judged under the <u>rational basis test</u>; specifically, the [regulation / guideline] must be rationally related to the achievement of a legitimate government purpose." **Id.** (quoting **Joel v. City of Orlando**, 232 F.3d 1353, 1357 (11th. Cir. 2000)).

Viewing the limited evidence in the light most favorable to Charest, said evidentiary assertions between suspect class treatment disparities challenged herein, offer sufficient facts for a legal argument to support the assertion that the newly amended regulations are facially unconstitutional under the Equal Protection Clause –in light of the first impression issue for Alabama under the *Wilkinson v. Dotson*, progeny –that Charest has been in fact treated fundamentally dissimilar as a definable group –suspect class with respects to the laws concerning non-violent offenders, and at times some violent offenders too – inapposite to Federal standards, accommodated others. Simply put, these Defendants cannot predicate any lawful standing to uphold these post amendatory Board "Articles" under the current challenge, therefore said post-guidelines remain both "*irrational and arbitrary*," under *Wilkinson*, when viewed cumulatively to the 640-X's in effect at the time Charest was both convicted / sentenced in 1995.

Strictly speaking, the Equal Protection Clause prohibits these Defendants from unfairly discriminating between equivalent groups. The Defendants may not act in an invidious or arbitrary manner, the key to determining whether these Defendants, in treating one group differently from another, has stepped over the line is to ascertain the

level of justification that these Defendants provided to explain their actions. No "single" standard defines the level of justification that is required; instead the Supreme Court has articulated three (3) distinct standards, the **first** and most lenient standard from the standpoint of prison administration, is the rational basis standard. It requires only that the classification be drawn for the purpose of serving a legitimate governmental interest and that the means chosen actually serve that interest. *See, e.g., San Antonio Independent School Dist. v. Rodriquez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed 369 (1911); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *Gregory v. Ashcroft*, 501 U.S. 452, 11 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Nordlinger v. Hann*, 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *F.C.C v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

However, in a stark, marked contrast, the **second** standard, the strict scrutiny standard, commands a close connection between the legislation or practice under examination and a compelling state interest. *See, e.g., Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (9174); *Miller v. Johnson*, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).    In between these two (2) positions lies the **third** standard, the intermediate standard of review; under it, there must be a substantial relationship to an important (although not compelling) state interest. *See, e.g., Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Plyer v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786, 4 Ed. Law Rep. 953 (1982); *I.N.S. v. Nam Nguyen*, 533 U.S. 944, 121 S.Ct. 2582, 150 L.Ed.2d 743 (2001).    Under traditional equal protection theories, the "*rational basis*

*test*," is most commonly applied to regulations in the social and economic field when nonfundamental rights are at issue, and when the regulations do not exclude "*suspect groups,*" such as racial or religious minorities. *See, e.g., Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855, 109 Ed. Law Rep. 539 (1996); *Rodriquez*; *Lindsley*, *supra*.

Charest maintains, as does the United States Supreme Court, that the "*strict scrutiny,*" will be the appropriate test when fundamental rights are at stake or a suspect classification is involved. *See, e.g., Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)(free speech); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1996); *Edelman*, *supra*.

Under current law, the intermediate standard applies to gender-based classifications. *See Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Califano*, *supra*. This Circuit, as well as others "*suggest,*" that the intermediate standard may also apply in cases involving important, but not fundamental, rights. *See, e.g., L. Tribe, American Constitutional Law,* 1591 −92 (2d.ed. 1988)(contending that the intermediate standard should apply to cases involving children or childhood). Whether to raise an equal protection claim-rather than one focusing solely on violation of a substantive right-depends in part, therefore, on an assessment of the standard of review used to resolve the equal protection claim. The reason is that the likelihood of a prisoner's suit resulting in relief on an equal protection claim can very well turn on the stringency of the equal protection standard applied by the court. However, in lieu of what's at stake, not only for Charest but also per se for others to follow if the *Turner v. Safley*, [482 U.S. 78] (1987) standard is applied to quell the equal protection claims, then the nature of the interest at stake, or in this case −in jeopardy than Charest's claims don't matter.

The invoked equal protection claim is one of first impression –in Alabama, under the ruling recently viewed in Four (4) other states, under the guidance –holding through *Wilkinson v. Dotson*, that "Alabama's [parole board] retroactive application of new[er], harsher guidelines to pre-guidelines violate the Constitution's Ex Post Facto and Due Process Clauses . . .", *inter alia*; thus Charest asserts, for the most part -what is in fact occurring at Alabama's parole board –based upon cumulative amended rules, regulations and guidelines being utilized to deny a suspect class of Lifer's parole, is likewise unconstitutional.

For the most part –this Court is more likely to fully grasp and understand a few seminal cases worthy of mentioning (i) in *Morrisey v. Brewer*, 408 U.S. 471 (1972) "it determined that due process imposed certain minimum procedural requirements which must be satisfied before parole could be revoked, that court defined 'it's minimum requirements'"; similarly that court in 1997 found (ii) in *Young v. Harper*, 520 U.S. 143 (1997) that "pre-parole or parole like programs fall under the same umbrella of creating a 'liberty interest,' that cannot be revoked without proper due process procedures"; then in another vein the Supreme Court came to a completely different conclusion (iii) in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1 (1979) –which dealt with "due process issues involving a group of Nebraska prisoners who filed a class action under 42 U.S.C. §1983 claiming, that they had been unconstitutionally denied parole by the Board of Paroles." **Id.** In like manner Charest asserts that "If the board determined that the prisoner was not a good risk for release, it denied parole, inform[ing] the prisoner *why release was deferred and made recommendations designed to help correct any deficiencies observed.*" **Id.** In its opinion on the case, the Supreme Court noted, although there is no constitutional or inherent right of a convicted person to be conditionally

released before the expiration of a valid sentence . . . There is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires." **Id.** It went on to state: "The Nebraska procedure affords an opportunity to be heard, and when parole is denied *'it informs the inmate in what respects he falls short in qualifying for parole; this affords the process that is due under these circumstances, the Constitution does not require more.*" **Id.** Charest envisions from this Honorable Court nothing more, nothing less —than adequate Constitutional plenary comity in accord with the Supreme Court's views on true justice. Change for Alabama is a necessity under *Wilkinson, supra.*

Defendant Wynne's misinterpretation of Charest's claim, regarding *"dissimilar treatment,"* in violation of the Constitution, is that although less serious offenders are granted, given for the most part preferential treatment concerning parole (i) *eligibility* and (ii) *consideration;* other violent offenders similar to Charest, are being treated *dissimilar,* given they (other Class A felons) are treated similar to the less serious offenders —in violation of the prohibition of the Constitution —which in fact remains a grave equal protection violation.

Charest maintains that he is similarly situated with other prisoners, those that have likewise been convicted / sentenced as for a Class A offense, whereas all other Class A felons are at present receiving more favorable treatment and that Charest is treated differently based upon a constitutional protected interest, under the Fourteenth Amendment.

DEFENDANT Wynne's *Ex Post Facto* Defense stated at pages 6 -10 that:

> "Wynne denies involvement in amending the Board's operating procedures. Wynne was not a member of the Board in any capacity when the Board's operating rues were amended in 2002. Wynne further denies violating the ex post facto clause by his actions in voting to deny Charest parole on 12-06-05." *Id*.

> "The *ex post facto clause* claims should have been presented within two years after Plaintiff knew or should have known that the 2002 amendments to the Board's guidelines could apply to Plaintiff . . ." *Id*.

> **"The amendments at issue have been highly controversial for several years. There have been dozens of cases litigated over this issue, and there are have been many news articles published over this issue. The three-year setoff guideline was first extended to five years in 2002, in a highly publicized meeting of the Board. This particular provision was the focus of animated debate during the meeting. . . . The subsequent amendment of these guidelines in 2004 was designed to improve the likelihood of a prisoner being given earlier consideration if [pg.7] appropriate circumstances arose."** *Id*.
>
> . . .

> "[Pg. 9] It is highly unlikely that Charest would be any more likely to be released in 2008 that he would be in 2010. He has not pled any facts that would support an inference that he is likely to be released if considered earlier. If his circumstances have materially changed, the Board has procedures in place whereby those changed circumstances can be weighed against the very negative circumstances of his case.    Charest    is serving life **sentences** for his crimes. He is not entitled to be released, and he is not entitled to be considered for release at any particular time. The Board has broad discretion to determine **whether** and **when his release is compatible with society's welfare**. . . ." *Id*.

(Emphasis-added).                    Defendant Wynne was never charged with making, or writing the *"unconstitutional amendments"* −only utilizing them against Charest to sum extent, whilst usurping other statutory mandates, nevertheless Charest will attempt to respond according, of course without the sarcasms attributed to allegations,

nature of the offenses which Charest has been wrongfully accused of, by the State of Alabama, as interesting as it may otherwise be for counsel to rehash old wounds –Charest had in fact "received from the very court that convicted him of the supposed crimes," in August of 2005 –four (4) months before his parole consideration Charest had consecutive Life **sentences** ran concurrent based upon the multiplicitious indictment, and one count "vacated" that was, the allegations of contributing to the delinquency of a minor based upon the trial courts lack of subject matter jurisdiction, nevertheless, said blessing came from a "negotiated plea agreement from the State to resolve the "Writ of Mandamus / Prohibition" sitting for almost a year at Alabama Supreme Court dealing with Charest's *defective indictment.*

Counsel seems to be like, per se the parole board members "*stuck in the past,*" Charest has spent almost Fifteen (15) years imprisoned, on a Life sentence, for a crime he did not commit, and to date, the facts have never been properly adjudicated by the Appeals Court, nor the Federal Circuit, the mere fact is, that ADEPA had been erroneously applied to Charest §2254, whereas the Southern District never had been granted, given the ample opportunity to review Charest's claim "*lack of sufficiency of evidentiary materials*" under the doctrine of *Jackson v. Virginia,* 443 U.S. 307 (1979) progeny.

Since imprisonment (1994), Charest has in fact, inapposite to Counsel Sirmon's allegations, grown and accepted responsibility for his previous twenty (20) year addiction to hard core *drug(s) and alcohol*, not to mention enrolled in an academic correspondence with *Blackstone Paralegal School* and successfully graduated with receiving his diplomacy almost ten (10) years to date, and maintained a clear record whilst participating in various Honor Dorms programs at G.K. Fountain in Atmore, Alabama –under Warden Jerry

Ferrell supervision –which the ADOC record / file would predicate, "*if Defendant Wynne,*

*or his subordinate colleagues were really interested in Charest's case.*"

§ 14.        Charest avers lost through *the ex post facto amendments,* as challenged,

preserving for plenary review a prime juridical cause for federal intervention, as follows:

> "the victim(s) request for a thirty (30) day notice or a waiver of
> notice is to be given to them by the Board before considering a
> prisoner for . . . parole . . .." Id. Under Alabama's Administrative
> Code 640-X-3-.05 (Victim Request or Waiver Notice) and attached
> Board's form, *see* "*Charest's Exhibit-8 dated 4/15/08 Affidavit /
> Exhibits 1 through 14.*"

> "the Board's action(s) to grant, deny, or to continue to a future date,
> an inmate who is being considered for parole by the Board." Id.
> Administrative Code 640-X-3-.06 (Action by Board) and attached
> Board's form, *see* "*Charest's Exhibit-9 dated 4/15/08 Affidavit /
> Exhibits 1 through 14.*"

(Emphasis-added).                Under the current legislative authority –the Board

is statutorily mandated to "Notify" the Attorney General's Office pursuant to §15-22-

36(d)(The Board) "[S]hall have no power to grant . . . a parole . . . until 30 days' notice that

the prisoner is being considered therefore has been given by the board to the Attorney

General . . ." Id.        Then again, under subsection (e)(1)(i) "[A] statement that all persons

required be notified under the provisions of this section will be allowed, at their option, to

either appear before or give their **views** in writing." Id.

Charest maintains that during said specific bureaucratic procedure, that Defendants

1) Wynne, 2) S. Williams, 3) Weatherly, 4) Longshore, 5) B. Riley, 6) T. King, and 7) M.

Shehane acted in concert, collectively, separately as they engaged in conduct constituting a

tortuous act, actions or shortly thereinafter upon receipt of such confirmation to interview

or investigate Charest prior to said parole board hearing -said Attorney General T. King

took a position to adamantly protest Charest's then forthcoming parole consideration,

then, tentatively scheduled for December 6th. 2005.

Charest maintains, *inter alia*, that prior to the Defendants amendatory enactment of pre 2002 –2004 guidelines, many prisoners sentenced to "*Life*," under Alabama's guidelines of being "hard on violent crimes" granting unto most, if not all an incentive to rehabilitate themselves, rewarding them with potentiality for discretionary parole, for example 640-X-2-.02 (Scheduling Cases for Parole Consideration), said guideline stated at section: "(1) As soon as practical after a prisoner is sentenced to prison, the Board causes a file to be prepared on the case. When complete, the Board members or their designee study the file and set a parole calendar date. This parole date is for initial parole consideration . . ."; inclusive to section: "(2) On cases involving crimes committed before May 19, 1980, the parole calendar date is set at one-third of the person term or ten years [1] whichever is less. In cases involving multiple convictions, the parole calendar date is set at one-third of the total term, whichever is less, or at one-third or ten years, whichever is less, of an individual sentence or combination of sentences whichever results in the latest parole calendar date. This calculation also determines the time at which majority vote parole may issue. Further said pre -guidelines state: "(3) On cases committed on or after May 19, 1980, as-applied to Charest, the Board uses the guidelines in establishing the initial parole calendar date. The guidelines take into account <u>past criminal record, pattern and nature (severity) of present offense, and the community attitude toward the offender</u>. Unless the Board determines that the guidelines should not apply, calendar dates will be as follows:

> "a).    If sentence is of ten years or more –and the offense is of a particular heinous nature or the present offense is of a violent nature and his previous behavior indicates a high risk potential for future violence –case shall be set on the maximum scale.

---

[1]    Alabama statute provides that earned incentive good time apply to time calculations for determining the time at which majority vote parole may issue. The Board also applies this credit in establishing a parole calendar date.

> " . . . .
>
> "c).    All cases will be set in accordance with the guidelines rating in Section III of the parole review worksheet and the scale for parole calendar dates. A copy of each document is included in Chapter 640-X-3 of this Administrative Code; *see Charest's previous Exhibit 1*; inclusive too, correspondingly *Exhibit 3* (640-X-3-.02 Parole review Worksheet), and *Exhibit-4* (640-X-3-.04 Interview / File Worksheet). Id. at *Charest's 4/15/08 Exhibits / Affidavit*.
> " . . . ." *Id*.

Charest argues that he is entitled to have his requests for parole considered under the statutory guidelines / regulations in effect at the time of his 1994 conviction. Specifically, Charest maintains that at the time of said conviction he was entitled to: 1) be personally interviewed before the parole consideration –hearing; 2) be heard by the parole board; 3) question evidence against him before the parole board, prior to adverse ruling; 4) present evidence on his fundamental behalf; and 5) be free from protests, by Maria LeBreton, Miriam Shehane (VOCAL) and per se the Attorney General's Office, absent full statutory compliance with the above substantive predicates.

Consequently for certain inmates respective to the Board's 640-X's –such as Charest who committed crimes before the cumulative amendments were enacted by the "Articles" which substantially altered the consequences to said previous crimes already configured into previous "*eligibility*" criteria Charest maintains retroactively "changed the quantum of [his] punishment." *Dobbert v. Florida*, 432 U.S. 282, 298, 53 L.Ed.2d 344, 97 S.Ct. 2290 (1977).        Inclusive to the above detriments applied to Charest's 2005 denial were subversions of Alabama's Code §15-22-36 and Alabama's Code §15-23-79, "creating further sufficient risks that time in prison will [be] increased because of Charest's inability to present evidence on his behalf, pointing out erroneous information, stop unnecessary protests from people who know neither the victim nor Plaintiff, [and] enabling Charest to

43

protect himself from false witnesses before the Parole Board." See *Weaver v. Graham*, 450 U.S. 24, 67 L.Ed.2d 17, 101 S.Ct. 960 (1981) –setting grounds for analysis –inquiry by this Court into whether an ex post facto violation occurred cause for applying the two (2) prong test: first, has a change in the law been given a retrospective effect; and second, has the change [challenged herein] disadvantaged Charest.

§ 15.        Charest maintains that Article I, 10 of the U.S. Constitution prohibits the states from passing any "ex post facto law, so much importance did the [C]onvention attach to [the ex post facto prohibition], that it is found twice in the Constitution." *Kring v. Missouri*, 107 U.S. 221, 227, 27 L.Ed. 506, 2 S.Ct. 443 (1883); which ultimately forbids Congress and States from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Cummings v. Missouri*, 4 Wall 277, 325-326, 18 L.Ed. 356 (1867). See *Lindsey v Washington*, 301 U.S. 397, 401, 81 L.Ed. 1182, 57 S.Ct. 797 (1937); *Rooney v North Dakota*, 196 U.S. 319, 324-325, 49 L.Ed. 494, 25 S.Ct. 264 (1905); *In re Medley*, 134 U.S. 160, 171, 33 L.Ed. 835, 10 S.Ct. 384 (1980); *Calder v Bull*, 3 Dall 386, 390, 1 L.Ed. 648 (1798)("The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty" after the fact. <u>Calder</u>, at 397, 1 L.Ed. 648 (Paterson, J.). See also *Fletcher v Peck*, 6 Cranch 87, 138, 3 L.Ed. 162 (1810)("An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed")).

Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. *Dobbert, supra; Kring v. Missouri*, 107 U.S. 221, 229, 27 L.Ed. 506, 2 S.Ct. 443 (1883); *Calder v. Bull*, supra, at 387, 1 L.Ed. 648. The ban also restricts governmental

power by restraining arbitrary and potentially vindictive legislation. *Malloy v. South Carolina*, 237 U.S. 180, 183, 59 L.Ed. 905, 35 S.Ct. 507 (1915*); Kring v. Missouri*, supra, at 229, 27 L.Ed. 506, 2 S.Ct. 443; *Fletcher v Peck*, 6 Cranch 87, 138, 3 L.Ed. 162 (1810); *Calder v. Bull*, supra, at 395, 396 1 L.Ed. 648 (Paterson, J.); the Federalist No. 44 (J. Madison), No. 84 (A. Hamilton).

The **Ex Post Facto** Clause is directed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S. Ct. 2715, 111 L.Ed.2d 30 (1990). In *California Department of Corrections v. Morales,* the Supreme Court rejected the argument that the **Ex Post Facto** Clause prohibits "any legislative change that has any conceivable risk of affecting a prisoner's punishment." *Cal. Dep't. of Corr. v. Morales*, 514 U.S. 499, 508, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). Instead, the Court held that the clause forbids only those retroactively applied laws that "**produce[] a sufficient risk of increasing the measure of punishment attached to the covered crimes**." Id. at 509.

Charest maintains prior to the Defendants amendatory enactment of post 2002 – 2004 guidelines, many prisoners sentenced to "*Life*," under Alabama's guidelines granting unto most, if not all  "violent crimes" an incentive to rehabilitate themselves, rewarding with potentiality for discretionary parole, for example as stated in 640-X-2-.02 (Scheduling Cases for Parole Consideration) -inclusive to pre -guidelines section "(3) On cases committed on or after May 19, 1980, as-applied to Charest," the Board used guidelines established prior to these two challenged amendments 1) 2002 amendment (increasing setting off inmates for parole review from three (3) years to five (5) before next parole consideration); and 2) 2004 amendment (process for re-examination by staff –within eighteen (18) of next eligibility for parole consideration); for Charest's initial parole

calendar date. The pre- 2002, 2004 guidelines took into account <u>past criminal record,</u> <u>pattern and nature (severity) of present offense, and the community attitude toward the</u> <u>offender.</u>

Retrospectively looking to the effects of the Board's 640-X's guidelines providing parole eligibility, and considerations to Lifers after serving one-third of the total term or ten years whichever is less and only being set-off in three year increments —unlike the 2002 and 2004 amendments cumulatively setting off Charest, now in increments of five years; additionally said enactments mandate the initial parole eligibility, consideration date shall be set in conjunction with the inmate's completion of 85 (eighty-five) per cent of his or her total sentence or 15 (fifteen) years, whichever is less, see Defendants' Exhibit-D page 3 subsection 7 (Article I intake).

Taken as a whole, permitting only paper reviews of files —instead of in-person hearings and eliminating *written reasons for denials* by declaring such reviews to not be "decisions" of the Board to whereas one provides a right to review in hopes of correcting his problems, wrongs as intended for being imprisoned after being denied on such information in said files —records, than no judicial review is necessary. This Court only has to look to the second prong, under *California Department of Corrections v. Morales*, [514 U.S. 499] (1995) and *Garner v. Jones*, [529 U.S. 244] (2000) to configure or wiggle sufficient room for discerning Charest's *"disadvantage"* on a case-by-case basis meeting the threshold requirement for public safety on Alabama's overreaching parole factors exposing Charest to an ex post facto violation effectuated by Defendant Wynne's relying on language in lieu of its prior "factors counseling in favor of discretionary release," standard.

Notwithstanding the *Jones,* and *Morales* determinations, as requested by Charest challenging the amended *"Articles,"* Charest suggests, requests that this Court look at the

46

"*practical implementations*" of the 2002 and 2004 parole board changes in the aggregate to determine the risks of prolonged incarceration as being "*significant.*" This Court, can ground its ensuing analysis in the substantive standard(s) governing Alabama's paroles – Alabama's §15-22-26 "No prisoner shall be released on parole as a reward for good conduct . . . but only if the Board of Pardon and Paroles is of the opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society . . ." **Id**. Also, §15-22-28(d) "No prisoner shall be released on parole expect by a majority vote of the board . . ." and subsection (e), *supra,* that "The board shall not grant a parole to any prisoner who has not served at least one third or 10 years of his sentence, whichever is the lesser . . ." **Id**. *See* Charest's previous *Affidavit* supporting this Reply to both standing, and day, date of accrual and ex post facto violation.

§ 16.        Charest asserts, maintains for brevity sake that for the most part Defendant Wynne's Special Report at pages 6 -10 is quite misleading under the recent holdings of other cases dealing with same, similar claims as raised –challenged herein, in that under the holdings of the United States Supreme Court rulings, in *Wilkinson v. Dotson; Monroe v. Thigpen; Thomas v. Sellers; Harris v. Hammonds, Garner v. Jones; City of Cleburne v. Cleburne Living Center, Inc.; Thigpen v. Bibb County, Weaver v. Graham, California Dep't. of Correction v. Morales; inter alia,* therefore Defendant Wynne, couldn't be more wrong for asserting boiler-plated defenses.

§ 17.        Charest maintains, that upon plenary review of the above-styled cases under their current application to Charest's unique, novel first impression claims in light of these additional sister circuit holdings: 1) In *Graziano v. Pataki,* 2006 WL 2023 the U.S. District Court case in S.D.N.Y. a §1983 suit challenging New York's *sub rosa* blanket parole denial

47

policy; 2) In *Foster Bey v. Rubitschum*, Case No# 2:05-CV-71318-MOB-VMM October 23, 2007 the U.S. District Court case E.D. Mich., for the Southern Division, held that cumulative changes to parole eligibility regulations for Michigan's Life –sentenced prisoners violated the U.S. Constitution's ban on *ex post facto* laws; 3) In *Penn. Prison Society v. Rendall*, Case No# 1:97-CV-01731-ARC March 13, 2006 the U.S. District Court case M.D. Pa. for the Middle District of Pennsylvania held that its 1997 law created a "*significant risk*" of increasing life-prisoners' punishment in violation of the *ex post facto clause*; and most significant for Charest to birth forth is the holding of the ruling in 2005 referenced herein as 4) In *William Dotson,* and *Rogerico Johnson,* two Ohio prisoners – challenged state's parole procedures, held permitted to bring actions under 42 USCS §1983 in the U.S. District Court for the Northern District of Ohio –claiming the state's parole procedures violated the Federal Constitution, See 329 F.3d 463 (2003 FED App. 147-P) – that this Court will likely conclude that its time to adjust –correct Alabama's unwillingness to otherwise provide its citizens a[ny] remedial review of parole board decisions –even under the auspice of common law certiorari –such "current state reasoning" is nothing other than a flagrant abuse of discretion, or per se a manifest injustice towards prisoners as a whole, by the agency, but moreover usurpation by State Court reviewing agency decisions which often more than not:

> "1) *results in decisions that [are] contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or 2) resulted in decisions that [are] based on an unreasonable determination if the facts in light of the evidence presented in the State court proceeding.*"

(Emphasis-italicized).     But for Alabama State Courts to flat outright refuse to address "Board decisions," along the vein argued herein this Court has both the authority and power under §1983 to invoke upon this State –the law of the United States Supreme Court

48

holdings, whereas most recently Judge Baschab specifically concurred, at page 2 of *Bostwick v. Ala. Bd. Of Pardon and Paroles*, 865 So.2d 1245 (Ala.Crim.App. 2003) –that: "Because of the majority appears to follow the current state of the law, I am **forced to concur in the result**.    However, **I also concur specifically to urge a change in the law**:

> "The Board argues, "there is no legal basis for a prisoner to seek judicial review of the Board's decision not to parole him." (Board's brief at p. 28.) Specifically, it contends that "the Alabama Legislature has given the Board of Pardons and Paroles discretionary authority to decide what prisoners may be paroled, and when, and under what conditions." (Board's brief at pp. 27 –28.) Therefore, it concludes "**the decision to deny parole is not reviewable**." (Board's brief at p. 25.) For the reason set forth below, I agree that such a decision is not reviewable in a state court." **Id.**

> "…

> "Alabama courts have previously held that decisions that are totally discretionary are not reviewable on appeal . . . "The courts have also held that such decisions are not reviewable on appeal." **Id at pp. 2, 3**;

The Court in *Bostwick*, *supra*., went on to state, at page four "We recognize that, in *Andrus v. Lambert*, 424 So.2d 5, 9 (Ala.Crim.App. 1982), this Court held: "While no constitutional or inherent right of a convicted person to be conditionally released prior to the expiration of a valid sentence exists, *Greenholtz, supra*, a prisoner has the **right to be properly considered for parole**. *Christopher v. Board of Paroles, supra; Wallace v. Turner, supra*, the paroling authority **must comply with constitutional requirements and may not determine parole eligibility on improper ground**." **Id**. Furthermore, that Court stated at page five "Based upon the Eleventh Circuit's holdings in *Monroe and Sellers*, we should overrule *Andrus*, and its progeny, including *Graves v. Alabama Board of Pardons and Paroles*, 845 So.2d 1, (Ala.Crim.App. 2002); *Strong v. Alabama Board of Pardon and Paroles*, 859 So.2d 1201 (Ala.Crim.App. 2001); *Tucker v. Alabama Board of Pardon and Paroles*, 781 So.2d 358 (Ala.Crim.App.

2000); *Tedder v. Alabama Board of Pardon and Paroles*, 677 So.2d 1261 (Ala.Crim.App. 1996) and *Sloan v. Alabama Board of Pardon and Paroles*, 647 So.2d 85 (Ala.Crim.App. 1994). *See "Charest's dated 4/15/08 Affidavit / **Exhibit-14**."*

§ 18.        Charest maintains, as did the United States Supreme Court in *California Department of Corrections v. Morales*, [497 U.S. 37] (1990) –that, "The *ex post facto clause* forbids those retroactive applied laws that 'produce [] a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Id*. Based upon said –such progeny which Charest relies upon for this Court's plenary review, requires this Court to apply the two-part test: (1) whether vel non **"the change** –[as in this instant case from the Boards 640-X regulations in effect at the time of Charest's conviction / sentence to the Boards post 2002, and 2004 amendments known as the "Articles"] –**are retroactive?";** and (2) if so, whether vel non **"it created a sufficient risk of increasing punishment?"** Therefore according to *Garner v. Jones*, {529 U.S. 244] (2000) progeny – this Court **must determine whether vel non** "the rule change violates the Ex Post Facto Clause either facially or as applied in *Garner*, 529 U.S. at 255." *Id*.    Hence, Charest maintains that the amendatory increments have in fact "*retroactively*," increased the times between being reviewed for said discretionary parole review, and Charest's lengthier eligibility set off dates are in fact, causing a sufficient risk of increasing the punishment for said previous crimes under the 640-X regulations, based upon altered, changed or in this instant action the amended "*guidelines*" broadening Alabama's standards for both 1) *parole eligibility*, and 2) *parole consideration* thus severely burdening Charest's rehabilitation success –envisioned by the 1994 "*sentencing*" *Court* and societies thoughts then, towards the allegations against said crime -in violation of the *ex post facto clause* of the Federal Constitution's Article I, § 10 whereas "the presumption against the retroactive

application of Alabama's new "*guidelines*" are an essential thread in the mantle of protection that the law affords the individual citizen. It's that presumption that remains "deeply rooted in [y]our jurisprudence, that embodies a legal doctrine centuries older that our Republic." *See Landgraf v. USI Film Products*, 511 U.S. 244, 265, 128 L.Ed.2d 229, 114 S.Ct. 1483 (1994). The specific prohibition on *ex post facto* laws is only one aspect of the broader constitutional protection(s) against arbitrary changes in the law, even if done through administrative agencies such the Parole Board.

The bulk of [y]our *ex post facto* jurisprudence has involved claims that the law has inflicted "a greater punishment, than the law annexed to the crime [when it was committed." *See Calder v. Bull*, 3 Dall 386, 390, 1 L.Ed 648 (1798). The United States Supreme Court utilized the progeny of *Weaver v. Graham*, 450 U.S. 24 (1981) in ("Foster Bey v. Rubitschum at 2:05-CV-71318-MOB-VMM citing *Wilkinson v. Dotson*, progeny"), as presented by Charest in § 6, pages 18 –19 *supra*, under Rule 201, Fed.R.Evid. It was also, likewise explained that such laws implicate the central concerns of the *Ex Post Facto Clause*: "*the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was committed.*" **Id., at Weaver**, supra.

§ 19.        Defendant Wynne's defense –asserting for the most part that the "*ex post facto claims should have been presented within two years after Plaintiff knew . . .*" Id. at Wynne's Special Report p. 6 ¶ 2, however, because §1983 does not contain a statute of limitations, reference must be made to the limitation periods prescribed by the state in which the litigation arose. *Burnett v. Grattan*, 468 U.S. 42, 49, 104 S.Ct. 2924, 2929, 82 L.Ed.2d 36, 44 (1984). In an attempt to avoid uncertainty and to provide a workable analysis for determining the applicable statute of limitations in section 1983 claims, the

Supreme Court recently held that the most appropriate statute of limitations for all §1983 actions is the personal injury statute of limitations of the state whose law is to be applied. *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). *Majette v. O'Connor*, 811 F.2d 1416, 1419 (11th Cir. 1987) —thus inapposite to Defendant Wynne's mere conclusory allegations that Charest's 2005 parole denial is barred is injudicious at best under Alabama's two (2) year holding accrues from the time of the injury in fact sustained, in this instant case it's 12/2005!

Charest maintains, and avers in regards to the statute of limitations for a 1983 action in Alabama is two years. *Lufkin v. McCallum*, 956 F.2d 1104, 1106, 1108 (11th Cir.), cert. denied, 506 U.S. 917, 113 S.Ct. 326, 121 L.Ed.2d 246 (1992); *Thigpen v. Bibb County*, 223 F.3d 1231, 1243 (11th. Cir. 2000), see Alabama Code §6-2-38(l)(n) to-wit "1) Statute of limitations for injury actions is two years under Ala. Code §6-2-38(l); a cause of action accrues when a party suffers an injury or loss or damage entitling him or her to maintain an action, 2) all actions commenced to recover damages for injury to the person or property of another wherein a principal or master is sought to be held liable for the act or conduct of his agent, servant, or employee under the doctrine of respondent superior must be brought within two years." *Nelson v. Estate of Frederick*, 855 So.2d 1043, 2003 Ala. LEXIS 56 (Ala. 2003).

The statute of limitations "does not begin to run until the facts which would support a cause of action are apparent to a person with a reasonably prudence with regards for his rights." *Calhoun v. Alabama Alcoholic Beverage Control Board*, 705 F.2d 422, 425 (11th Cir. 1983) (quoting *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir. 1975)). Thus §1983 actions do not accrue until the plaintiff knows or has reason to know that he has been **injured**. (Emphasis-added). *Calhoun*, 705 F.2d at 424; *Rubin [v.*

52

*O'Koren]*, 621 F.2d [114,] 116 [(5th Cir. 1980)]; *Lavellee [v. Listi]*, 611 F.2d [1129,] 1131[(5th Cir. 1980)]. Nor will a §1983 action accrue until the plaintiff is aware or should have been aware **who has inflicted the injury**. *Lavellee*, 611 F.2d at 1131 (quoting United States v. Kubrick, 444 U.S. 111, 100 S. Ct. 352, 62 L.Ed.2d 259 (1979)). *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987).

Charest's parole denial came on December 6th of 2005 –and it was not until after said only denial under the amendatory parole board "Articles" giving rise for a §1983 claim to have accrued, did Charest have a right to redress the injury –whereupon the statute of limitations begins to run when "facts which would support a cause of action (or standing due to an injury caused, by the effect of said parole denial) apparent to a person with reasonable prudence for his rights." *Mullinax, supra, see also Ashcroft v. Randel*, 391 F.Supp.2d 1214, 1219 (N.D. Ga. 2005)(Story, J.)(noting that the federal "discovery rule" governing the accrual of a §1983 action provides that "a claim accrues when the injured party knew (1) he **suffered the injury that form[ed] the basis of his complaint** and (2) who **inflicted that injury**"). **Id.**

§ 20.    Last of Wynne's erroneous assertions before this Court, predicates that Defendant Wynne doesn't have a clue to the actual facts of, either Charest's case, or even his prison file or much else, whereas Wynne stated, that "*Charest is serving life **sentences** . . .* " (plural) –when in fact Charest has but one "life." Again, if I may add showing the confusion of the Boards subtle subterfuge to contradict Charest's growth.

DEFENDANT Wynn stated at page 9 that:

> "Charest . . . is not entitled to be considered for release at any particular time." *Id.*

§ 21.    Contrary to such global defense, first Charest points out to this Court, that §15-22-24(e), Code of Alabama, 1975 states: "*The board may adopt policy and procedural*

*guidelines for establishing parole consideration and edibility* based on its evaluation of a prisoner's prior record, nature and severity of the present offense, potential for future violence, and community attitude toward the offender." **Id**. Did not the Board adopt and promulgate on or about September 29th. 1982 "640-X-2.01 through 640-X-2.15 and 640-X-3-.01 through 640-X-3-.11 Exhibited-1, *infra*, for instance 640-X-2-.02(8) (Scheduling Cases For Parole Consideration) –states: "*A parole calendar date may be changed by order of the Board. No calendar date will be scheduled **prior to service of one-third of the term or ten years for total terms of ten years** or more except by unanimous action of the Board. **When an inmate is denied parole, the Board will determine when his case is to be reset but in no event shall it be reset for more than three years from the date of the denial**." *Id. at Charest's Exhibit-1, pp 4, 5 under subsection 8.*

Defendants have already openly admitted in one answer that Charest "*has served more than ten years on his life sentence, and that a majority could grant parole . . .*" *id.* Contrary to Defendants conclusory allegation, Charest has in fact, presented by both State statute and the Boards adoption of said pre-guidelines "a right to be considered for parole at a particular time"; also instructive for this Court's plenary review on said allegation by Defendants is §15-22-28(a) holds, otherwise: "*Minimum sentence to be served prior to eligibility for parole: (a) It **shall** be the duty of the Board of Pardons & Paroles, upon its own initiative, to make an investigation of any and all prisoners confined in the jails and prisons of the state with **a view of determining the feasibility of releasing the prisoners on parole and effecting their reclamation**. **Id.*** The linchpin failure of the Honorable Attorney General's denial @ p. 9, is quite simple. He couches his language in just the manner that is dispositive inherit in this suit. He denies that the plaintiff has a

54

right to be "considered." At no point has this petitioner plaintiff said that he has a right to parole.... ONLY that he must be considered in order for the State to comport with Alabama's own due process requirements.

DEFENDANT Wynne's defense to *Conspiracy* at page 10 that:

> "Wynn denies conspiring with anyone to violate Charest's rights. The Complaint contains conclusory allegations that a conspiracy exists between the Board, the Attorney General, and the nonprofit corporate known as VOCAL . . ." *Id.*

§ 22.    As nice as such denial may "*sound*" to someone unlearned in the law –such mere assertion absent Defendant Wynn providing, furnishing or otherwise producing the evidentiary materials to support his legal position to this Court, as Charest requested during *DISCOVERY* –Defendant Wynne's allegations remain wholly deficient in Federal Court – inapposite to underpinning established by Charest's "*Affidavit that such conspiracy took place during the investigation and pre -parole hearing with Parole Board agents, employees and one specific Maria LeBreton inclusive to Miriam Shehane (VOCAL) others not statutorily entitled to Notice, Appearance and specifically under 640-X guidelines to have protested Charest's parole –with false information,*" to date all of which has "**yet**" by these Defendants "**been lawfully or legally contravened**" pursuant to Rule 26(a) – (b)(1), Fed.R.Civ.P., "disclosure" nor has Defendant Wynne fully complied with Charest's motion styled 1) Production of Documents; 2) Interrogatories and 3) Admissions as filed by Charest on July 7th. 2008 (Doc# 94, 95), which this Court ordered Defendant Wynn to otherwise, respond or object too, by August 1st. 2008, whereupon receipt of such –Charest will in fact respond accordingly thereinafter.

Once again, it is argued, that pursuant to 42 U.S.C. 1985(3), a 1985(3) claim requires proof of: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal

privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of United States." *Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997)(Emphasis-added)). "In order to prove a private conspiracy in violation of the first clause of 1985(3), a plaintiff must show, *inter alia*, (1) that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action(s),' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68, 122 L.Ed.2d 34, 113 S. Ct. 753 (1993)(Emphasis-added).

Charest maintains that Defendants Wynne, Williams, Longshore and Weatherly were acting, in some sense, in concert when the *"injury in fact accrued"* and when said individuals circumstantially agreed, along with the Defendants (i) B. Riley [his office, agents, employee's] (ii) T. King [his office, agents, employee's], (iii) M. Shehane [her office VOCAL, or agents, employee's] -orchestrated a common scheme to deny Charest parole, simply because of being an alleged "sex offender" prior to the actual December 2005 hearing, day –date based upon the 'class-based, invidiously discriminatory animus behind the conspirators' actions,'" causing Charest to suffer an injury, *see Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268-69, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993)(quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971)), *see also Burrell v. Bd. of Tr. of Ga. Military Coll.,* 970 F.2d 785, 789 (11th Cir. 1992), cert. denied, 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993); *Denney v. City of Albany,* 247 F.3d 1172, 1190 (11th Cir. 2001), all of which Charest asserts, maintains remains the causal connection between the injuries sustained and the conduct complained of –which §1983 can in fact remedy under the *Wilkinson* progeny; whereas Charest had

only requested "*prospective declaratory / injunctive relief challenging Alabama's unfair, discriminatory parole procedures utilized to deny (i) <u>parole eligibility,</u> (ii) <u>parole suitability,</u>* under the holdings of <u>*Wilkinson.*</u>

§ 23.         Charest maintains that Defendant Bill Wynne Jr., did on, or before December 6[th.] 2005 through a continuous series of discriminatory acts "collectively, separately and or individually while acting under color of State law under §15-22-20 (Board's creation); §15-22-24 (Duties); §15-22-25 (Investigations); §15-22-26 (Standards for release on parole); §15-22-28 (Investigation for parole); §15-22-29 (Conditions of parole); §15-22-38 (Duties of Board members —mandatory, powers, strictly enforced); §15-22-39 (Penalty for neglecting or failing to perform), *inter alai,* Code of Alabama, 1975 —conspire with the other named Defendants by means of conversations, phone communications, telex's or other electronic means —thereinafter denying Charest of Federally protected rights enjoined him through the Fourteenth Amendment violating both §1983 and §1985(3) strictures, in that Defendant 1) Wynne, 2) S. Williams, 3) R. Longshore, 4) V. Weatherly conspired for the purpose of depriving Charest of equal protection of the laws while said Defendants engaged in active communications during the investigation of considering Charest's parole consideration between October of 2005 up to, and including December 2005 with Defendants 5) Governor B. Riley's office, 6) General T. King's office and 7) director M. Shehane at VOCAL, and 8) M. LeBreton —said individual's did arbitrarily, capriciously usurp Legislative intendments, cited above, in denying Charest parole, whilst utilizing for the most part their newly intrusive amendatory enactments of 2002, and 2004 parole board guidelines, known as the Board's "Articles," inapposite to Alabama Administrative Code 640's in effect at the time Charest was in fact, convicted / sentenced, now subject to plenary review for its *retroactive* application to Charest.

Additionally Charest maintains that the associated press in Montgomery on March of 2006 released, exposed to the public –which Charest requests that this Court "take judicial notice of, under Rule 201, Fed.R.Evid.," whereas the State was investigating Alabama's two-year college system when General King had asked, requested Chancellor Roy Johnson help in obtaining grant money for the executive director Miriam Shehane of Victims of Crime and Leniency (VOCAL) whereas King himself accompanied Shehane to a meeting with Johnson –requesting money for VOCAL.

The newspaper article brought out, that King and Shehane "had talked about VOCAL's losing some funding and the possibility that law enforcement grants could be available from the two-year college system," as odd as that may otherwise seem to some, but not so especially to this Court's learned eye, that is "the very system that Troy King's office was already in fact 'investigating, for almost two consecutive years'" was the same persons, parties Troy King sought after to assist in financing VOCAL's troubled future –as was alleged in Charest §9183 Complaint claim one. Worthy of particular interest is that it was not until <u>November of 2006</u> that Defendant King "removed himself from the college system probe," thereby giving himself, or his office previously to said removal, ample opportunity, motive to have influence /or actually likewise himself been influenced with, by M. Shehane's (VOCAL) extraneous input against Charest which remains the casual nexus for Charest's conspiracy claim; which Charest's asserts as part of the wheel to have erroneously denied his December 2005 parole. See Charest's **Exhibit-2 at: "***Charest's 4/15/08 Affidavit and Exhibits 1 through 14***"** adopted herein.

DEFENDANT Wynne's statement at page 8 that:

> "**The simple truth**, as unpleasant as it may be for Charest, **is that very few sex offenders are ever paroled**, and those who are paroled usually spend significant time in prison before being released. **This is consistent with §15-22-26**, in that **it is difficult for the Board to say with any degree of confidence that they are persuaded that sex offenders are likely to obey [p. 9] the law in the future** or that their release is compatible with society's welfare.
>
> "...
>
> [p.9] "**It is highly unlikely that Charest would be any more likely to be released in 2008 than he would be in 2010. He has not pled any facts that would support an inference that he is likely to be released if considered earlier.**
>
> "...
>
> "**Charest is serving Life sentences for his crimes. He is not entitled to be released, and he is not entitled to be considered for release at any particular time.** _Id_.
>
> (Emphasis-added in bold).

§ 24.      First, as this Court can plainly see for itself, not only is the Board openly asserting for the most part, inapposite to other **similar** Class A Felons, a discriminatory action for both parole (i) *eligibility*, and (ii) *consideration* –but in fact Defendant Wynne's position is that, because Charest is accused of, and serving time for a *"sex offense,"* that allegedly "**it is difficult for the Board to say with any degree of confidence that they are persuaded that sex offenders are likely to obey the law in the future.**"

Id. at Wynne's page 9.      Apparently, as far as the parole board members are concerned *"sex offenders"* are more apt to *"not obey the law"* –when compared with other Class A felons, being reviewed parole *"eligibility"* and *"consideration"* such as (i) Homicides, (ii) Arsons, (iii) Kidnappers, (iv) Traffickers, (v) Assaults, (vi) Stalkings (vii) Thefts, (viii) Forgery's, (ix) Adultery, Incest, Bestiality, just to mention a few.

The reality is, as this Court well knows better than Charest, regarding Alabama's statistics –which directly refute Defendant Wynne's ludicrous statement –about "*sex offenders not being able to obey the laws **if released**,*" as compared to other ***similar Class A felons***, such as "(i) Traffickers, (ii) Assaults, (iii) Thefts, (iv) Forgery's, (v) Adultery, Incest," so in essence -<u>if the truth be told</u> **these Class A felons are more apt not to obey the law** –when released on parole –inapposite to sex offenders, see Alabama's Sentencing Commissions' 2008 Executive Summary Report hereinafter attached as (**Charest's Exhibit-15**), which Charest enters into the record as evidence – under Article II of Fed.R.Evid., Rule 201(d), as follows:

> "[P. 56]:    '**2007 Pardons and Paroles Statistics**, Paroles considered 6,640, Paroles denied 4,453 (67% denial), Paroles granted 2,187 (33%), **Paroles Revoked** 870 (9% revocated), Technical 378 and New Offenses 207.'"

> "[P. 59]:    '**Pardon and Paroles Boasts 4.1 % Recidivism Rate.**'"

> "[P. 60]:    '**L.I.F.E. Tech's**. Facility stats, factual relevancy herein, is that out of the 958 male parolees to Thomasville, 103 inmates were subsequently revoked.'"

> "[P. 61]:    '**Alabama Begins to Focus on Re-Entry for Effective Corrections**,' the assertion applicable to Charest's current claim, is as follows: '*Alabama must continue to work to provide a true continuum of punishment options, including more opportunities for successful re-entry into the free world after prison. The safety of the public depends on the successful re-entry of these individuals. The L.I.F.E. Tech programs must continue to expand to offer successful **to all [P. 62] felony offenders who can take advantage of these opportunities before being released**.*'" Id.

(Emphasis-added).                          <u>First, and foremost the language utilized, promotes constitutional equality among **"all felony offenders . . . before being released.** Id.         This Court can see for itself, the numbered inmates whom were granted Parole, albeit for the fiscal year 2007 predicates a bleak thirty-three (33) percent of

parolees.  Out of said **similar** same class —group granted discretionary parole in the instant case, as mentioned by Wynne, which for the most part "excludes sex offenders," the nine (9) percent revoked stem from the so called other Class A felons, and none if I may add are "*sex offenders*," according to Alabama's own judicial study, came back!

**Figure 10:**

"[P. 72]:        '**Stock Population on September 30, 2007**, is as follows:

| Offenses | Ratings | Inmate # Amount |
|---|---|---|
| Murder | 1st. | 3,941 |
| Robbery | 2nd. | 3,527 |
| Poss. Cont. Sub. | 3rd. | 2,341 |
| Dist. Cont. Sub. | 4th. | 1,709 |
| Burglary 3rd. | 5th. | 1,439 |
| Theft of Prop. | 6th. | 1,152 |
| Burglary 1st. | 7th. | 1,102 |
| Rape 1st. | 8th. | 1,087 |
| . . . | . . . | . . . |
| Sodomy 1st. | 19th. | 512 |
| . . . | . . . | . . ."' |

Alabama's own figures, predicate, "**Fifty (50) percent** of the Current ADOC population is comprised of one of the Top Seven (7) Offenses." Worthy of particular note, is that of the Top Twenty-Five (25) Offense Category, the report finds that (i) Fifty-Two (52) percent are for **personal** crimes, (ii) Twenty-Four (24) percent are for **property** crimes and (iii) the remaining **drug** crimes fall into the Twenty-Four (24) percent. <u>Id. at Exhibit-1, p. 72</u>. Next for plenary review is Charest's documented excerpt, found at:

**Figure 12:**

"[P. 73]:        '**Most Frequent Offense at Conviction**, are <u>Drug and Property Offenses</u>, which account for Ninety-Three (93) percent of the Top −10 Offenses'" currently being convicted. Noting for the evidentiary record herein of the listed class's exhibited, can this Court —or Charest find any "sex offense" crimes in Alabama's Executive Summary chart; next in line for review refuting Defendant Wynne's discriminatory comments —supporting Charest's §1983 challenges is:

**Figure 13:**

"[P. 74]:    '**Most Frequent Non-Capital Offenses**, from October 1, 2004 through September 30, 2007 being in the Top Twenty-Five (25) category'" –are Class A felons which Charest asserts are being paroled, but in fact come right back. *See also, pp. 75 –77* at Exhibit-1.

Charest respectfully requests that this Court review for itself, as did Charest the listed category offenses **similar** to the "class from which this Court can ascertain that Defendant Wynne is acting discriminatory towards" –"*sex offenders*," in violation of the Fourteenth Amendment, of the United States Constitution, under the "*equal protection clause.*" See *Damiano v. Fla. Parole & Prob. Comm'n.*, 785 F.2d. 929, 932 –33 (11th.Cir. 1986); *Jones v.* ray, 279 F.3d. 944, 946 –947, (11th. Cir. 2000). Next for plenary review is:

**Figure 17:**

"[P. 78]:    '**Prison Admissions –Top 25**, new offenses stemming from October 1, 2004 –September 30, 2007'" –which Charest request that this Court "take judicial notice of," under Rule 201, Fed.R.Evid., the best that can be accredited to Defendant Wynne's assertion "**it is difficult for the Board to say with any degree of confidence that they are persuaded that sex offenders are likely to obey the law in the future**." Id. at Wynne's page 9, is that in the fiscal year 2007, in category OFFENSE #**25** under the heading of Rape 2nd. -Only Ninety-One (91) persons were convicted / sentenced to the ADOC.    Charest    does    not make lightly of such limited personal offense, however, when compared to the other category offenses, such as Robbery #5 –398 were sent, Murder #17 –241 were sent, Burglary 1st. #16 –157 were sent, Assault 1st. #18 –138 were sent, Manslaughter #22 –86 were sent; Charest asserts for Defendant Wynn to flagrantly distinguish one Class A felon –for parole inapposite to other Class A felons remains "*unconstitutional.*" Id. at p. 78 Exh-1, infra.

**Figure 18:**

"[P. 79]:    '**Prison Admissions for New Offenses**, these Offense categories stem from October 1, 2004 through September 30, 2007,' whereas this Court can see, for the most part that "**Property Offenses rose some Nine (9) percent in 2007,** *id.* at p. 79;" additionally the graphs herein, predicate that "**Personal crimes**" are significantly less in each fiscal year, for example FY-05 shows (i) Drug convictions at 3,412, (ii) Property convictions at 2,581, and (iii) Personal convictions at 2,136; then in FY-06 shows (i) Drug convictions at 3,337, (ii) Property convictions at 2,562, and (iii) Personal convictions at 2,325; and last for comparative

purposes is FY-07 with (i) Drug convictions at 3,173, (ii) Property convictions at 2,785, and (iii) Personal convictions at 2,380, so in essence Drug offenders and Property crimes are growing while Personal crimes / convictions are far less —which directly contradicts Defendant Wynne's disingenuous assertion that "sex offenders," are more apt to "not obey the laws, if released."

**Figure 19:**

"[P. 80]:    '**Prison Admissions (all admissions) by Types**,'" as interesting as it may have otherwise been for Defendant Wynne to discriminate primarily —against "sex offenders;" these Executive figures herein, charted show —that "split sentence and new court commitments account for seventy five (75) percent of new court commitments, and that "parole / probation" revocations account for only twenty-five (25) percent of the ADOC admissions, perhaps it's safe to assume Defendant Wynne's allegation should not be granted any validity, but for the sake of argument Charest will support his claims, that Alabama's Parole Board is in fact, operating its administrative agency in an unconstitutional fashion based upon amendatory enactments that remain discriminatory against a suspect class of specific Class A felons in violation of the Fourteenth Amendment.

**Figure 20:**

"[P. 81]:    '**Prison Releases**,' from October 1, 2004 through September 30, 2007 predicating fiscal years 2005, 2006 and 2007, and for the most part —once again for comparative purposes Charest will share only 2007 statistics, starting with the Top 25 of releases / categories: (1, 2) Poss. & Dist. of Controlled Substances —shows 1,848 inmates released; (3) Robbery 1st. inmates 796; (4) Burglary 3rd. 790 inmates; (6) Felony DUI 571 inmates; (Assault 2nd. 266 inmates; (17) Murder 188 inmates; (23) Assault 1st. 129 inmates; and finally next to last Rape 2nd. Coming in at No# 24, released 108 felons." All of these Class A, some Class B felons show this Honorable Court whom the Board considers for its discretionary parole release, which Charest asserts are the ones whom for the most part —are considered by Defendant Wynne more likely not to violate, so why then are they returning to prison when paroled? Could it very well be, that perhaps Alabama's Parole Board is releasing the wrong felons, after all, nowhere in the Executive Summary Report data, is one single case where someone convicted for First Degree Rape / Sodomy has been released, had returned, *so where does Defendant Wynne get his figures from.*

**Figure 21 & 22:**

"[PP. 82, 83]:    '**Prison Release Offense Categories and the Type of Releases**,' shows for the most part "**Property & Drug**" offenses have increased, while "**Personal Offenses**" have in fact decreased by four (4) percent in 2007."    Worthy of particular interests is, that "**Personal**

**Offense Releases**" dropped by nearly three-hundred (300) inmates – showing a significant disparity towards the class suspect Charest spoke about being arbitrarily and capriciously denied both (i) *eligibility* and (ii) *consideration* under the newly amendatory Board's "Articles" inapposite to the 640-X strictures.

**Figure 23:**

"[P. 84]:    '**Prison Releases by Type**,' which predicates for this Court –once again the unconstitutionality addressed in Charest §1983 Complaint, whereas this chart shows the volatility of the Three (3) release types, once again predicating the greatest variation, that is, during October of 2004 through September 2007 both, split sentence and EOS inmate release – have for the most remained relatively stable and maintained similar numbers, compared to the "**Personal Offenses**" being paroled." *Id. at Exhibit-1, p. 84*. **Figure 24**, at Page 85 breaks down the complexity – worthy of particular interests between the three (3) types of offenses now challenged by Charest's §1983 facts.

§ 25.     Next up for review –would be Defendant Wynne's assertion, that "*very few sex offenders are ever paroled, and those who are paroled usually spend significant time in prison before being released. This is consistent with §15-22-26, in that it is difficult for the Board to say with any degree of confidence that they are persuaded that sex offenders are likely to obey [p. 9] the law in the future*." Id. at Wynne's Special Report 7/02/08.

The statement quoted above by Wynne remains absurd at best, in light of the statutory language enumerated in §15-22-26, quoted hereinafter in relevant part "*no person shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the Board of Pardon and Paroles is of the opinion that there is a reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with welfare of society. . . .*" Id. Charest maintains, *inter alia*, hereinafter that –Defendant Wynne has once again misapplied Legislative intent incongruent with Charest's factual "*record proper*" and although the statute speaks openly as granting unto the Board of Pardon and Paroles exclusive authority to *grant* parole –that authority is not

64

"*unbridled*" as paraded before this Court by Defendant Wynne's erroneous finger pointing inapposite to Charest's fundamental immutable Fourteenth Amendment rights protected by the United States Constitution.

The statutory duties placed upon the Board, or more important Defendant S. Williams [then Chairman] over Defendant Wynne [then assigned as a special member] to help alleviate Alabama's overcrowded prisons, whereas Defendant Wynne sat alongside another special member named "McGriff" at Charest's 12/2005-parole hearing.

The statute (§§15-20-22(j)(k), Code of Alabama, 1975) was grossly usurped and said violation as argued above, at pages 28 –31 @   §§9, 10 is herein adopted and fully incorporated as same therein for brevity sake, nevertheless warranting mandatory action by this Federal court.                    Alabama law is clear "the Board's statutory duties are mandatory and the limitations and restrictions therein are to be *strictly construed.*" See *Ellard v State,* 474 So.2d 743 (Ala.Crim.App. 1984), aff'd, 474 So.2d 758 (Ala. 1985).

Because Defendant S. Williams failed to sit in, alongside or shortly thereinafter participate in accordance with §15-22-20(j) mandates (i.e., *[t]he board shall sit in two panels of **three** for the purpose of conducting hearings and making determinations concerning paroles . . ."),* the decision making process on December 6[th.] 2005 by then, special members Defendant Wynne, and another party one Mr. McGriff remains a complete nullity in violation with §15-22-26 (Standard for release of prisoners on parole); and §15-22-39 (Penalty for neglecting or failing to perform duty), whereas said statute predicates, as follows:

> "Any member of the Board of Pardons and Paroles who knowingly or willfully neglects or *fails to perform any duty enjoined upon him by the provisions of this article is guilty of a felony* . . ." *Id.*

(Emphasis-underlined).               §15-22-20(j) leaves no room for ambiguity

"During the term of the special members of the board **shall** sit in two panels **of three for**

**the purpose of conducting hearings and making determinations concerning**

**paroles . . ."** Id. Defendants Weatherly, Longshore on or about March 14th. 2008 entered

into this Courts records an "Exhibit, marked as A," coupled to their "Response to Discovery

Requests," therein predicating only two (2) signatures, that of "Wynne and McGriff," dated

12/06/05, this in and of itself demands relief as requested by Charest, that the parole board

process was in fact usurped by the Board, then, and again when said statute is read in *pari*

*materia* with Defendants Exhibit-D, known as *"Article Six,* at subsection thirteen (13)

which, again, leaves no room for ambiguity, as follows:

> "13.    If only two [2] members of the Board are present to hear a
> case requiring unanimous approval, the Board may pass over that
> case to hear other cases on the docket [which it did not do with
> Charest] **pending arrival of the remaining member**
> **[Chairperson Williams] the third member does not return**
> **that day, the Board may offer those present an opportunity**
> **to express their views, and the two [2] members present**
> **may ask questions, but the two [2] members shall not**
> **deliberate in the absence of the third member**. The case **shall**
> be continued to a date certain, which **shall** be announced in open
> public meeting, **at which time the entire board will take**
> **action**. Only one continuance **shall** be scheduled. In the event that
> the Board is unable to decide the case on the date specified, the case
> **shall** be rescheduled for further consideration as early as is
> practicable, consistent with statutory requirements." **Id**.

(Emphasis-added)(Act 2003 –415, p. 1205, § 1).           Defendants Exhibit-A (Charest 2005

parole board decision) only exhibits two (2) signatures –mandating another parole review

in accordance with Alabama law, but moreover without the extraneous influences, from

either (i) M. Shehane at Vocal, and (ii) M. LeBreton a third party, not relevant to the

victim, nor the accused "Charest," simply a person placed before the Board by said

Defendants to "protest Charest" whereupon the false information was spoken before the Board which Wynne, and McGriff relied upon, to deny parole.

DEFENDANT Wynne's *Evidentiary Materials* stated at page 10 that:

> "Attached hereto are copies of the following documents: Exhibit 1 Affidavit of Bill Wynne dated 6-30-08." *Id.*

§ 26.    Not only has Defendant Wynne failed to properly assert a facial defense, for his direct insolence to the statutory codifications of Alabama's §§15-22-20(j)(k), and §15-22-39 strictures, but Defendant Wynne has failed to have his "Affidavit ***notarized***," thus his Special Report remains wholly deficient absent any seal, signature under perjury, see Defendant Wynne's Affidavit exhibited A, page 2, attached hereto as **Charest's Exhibit-16**; therefore there remains no verified evidentiary testimony of prove by Defendant Wynne to contravene Charest's attestations, shifting the burden of proof upon Charest, under either (i) *Anderson v. Liberty Lobby, Inc,* [477 U.S. 242] (1986) and / or (ii) *Celotex Corp. v. Catrett,* [477 U.S. 317] (1986) strictures, thereby invalidating Wynne's legal position under the Federal Rules of Evidence, Rule 806 as defined by Rule 801(d)(2)(C), (D) or (E) —thus this Court thus has before it —from Defendants (i) Weatherly, (ii) Longshore, and (iii) Wynne inappropriate (a) *pleadings,* (b) *affidavits* negating any credence to support their *ANSWER,* and absent sufficient affidavits based upon 1st hand knowledge under the legal progeny of a Notary Seal -Defendant Wynne's position falls short of being admissible to contravene Charest's §1983 "claims."

In closing, Charest opposes Wynne arguing a denial to a liberty interest in parole, as Charest's *"issue"* that does not remain before this Court, Charest averred —that Wynne reviewed, relied upon false and erroneous information in denying parole *"consideration"* and furthermore, the five (5) year enhanced set-off remains a flagrant abuse of discretion for Charest's future parole *"eligibility"* under *Wilkinson,* progeny —a case of first

impression for Alabamians, thereby duly entitling imminent relief, *see* Charest's Affidavit, attached hereinafter as **Exhibit-17**.

WHEREFORE, premises considered Plaintiff Charest prays that this Court would graciously view the above "Reply to Defendant Wynne's Special Report," in a light most favorable to the issues at hand –contrary to Defendant Wynne's conclusory statements inapposite to the law of the case doctrine herein –and for this Court not be persuaded to follow counsel's *"bread crumbs leading down the wrong trail."*

Charest's relief for prayer in the §1983 remains colorable –enabling this Court to **grant** anew-constitutional parole board determination in accord with State law –albeit limited in nature to another parole hearing, and issuing for the most part –Charest's *declaratory / injunctive* relief.

Done so this August 1st 2008.

Respectfully submitted,

PATRICK JOSEPH CHAREST
Pro-se' #182262
Limestone Correctional Facility
28779 Nick Davis Road
Harvest, Alabama 35749-7009

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a true and correct copy of the REPLY upon the Defendants by placing said same in the United States mail, properly addressed, postage prepaid as follows:

1.  Defendants Williams (Wynn), Weatherly, Longshore et. al.,
    C/O Chief Counsel Honorable Steve Sirmon
    Attorney for Alabama Pardon & Paroles
    Post Office Box #302405
    Montgomery, Alabama 36130

Done so this August 1st 2008.

Respectfully submitted,

Patrick Joseph Charest #182262
Harvest, Alabama 35749-7009

68



Charles, Patrick #182262
Inmate C.F. Zipin
2879 Nat Oaks Rd.
Harvest, Alabama
35749

CV-2-07-984-MHT

Legal Mail

United States Federal Court for
the Middle District of Alabama
Attention: Hon. Debra Hackett
Post Office Box 711
Montgomery, Alabama
36101-0711

This correspondence is forwarded from
[A]labama State Prison. The contents
ha[ve] not been evaluated, and the Alabama
Department of Corrections is not
responsible for the substance or content
of the enclosed communication.

PRIORITY MAIL
UNITED STATES POSTAL SERVICE®

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

CIVIL CASE NO: 2:07-CV-984-MHT

PATRICK J. CHAREST, Pro-se #182262

PLAINTIFF

Vs.

ALABAMA PARDON & PAROLES, et. al.,

DEFENDANTS.

---

# E X H I B I T
## 15

Alabama's 2008 Executive Sentencing Commission Report

---

Prepared by:

Patrick Joseph Charest #182262
LIMESTONE CORRECTIONS
28779 NICK DAVIS ROAD
HARVEST, ALABAMA
35749-7009

# ALABAMA SENTENCING COMMISSION

## 2008 Report

# Sentencing Standards Implementation:
# Emphasis on Data Quality, Collection, and Analysis

300 Dexter Avenue
Suite 2-230
Montgomery, Alabama 36104
Phone: (334) 954-5095
1-800-954-9411 ext.5095
Fax: (334) 954-5201
E-mail: sentencing.commission@alacourt.gov
Website: http://sentencingcommission.alacourt.gov

# Table of Contents

Acknowledgments i
Alabama Sentencing Commission Members ii
Executive Committee Members iii
Advisory Council Members iii
Commission Staff iv
Standards Committee Members iv
Legislative Committee Members v
Cooperative Community Alternative Sentencing Project -
    Statewide Steering Committee Members vi
Uniform Sentencing Order Committee Members vii
Letter from Chair ix

*Executive Summary* x-xvi

*Year in Review* xvii-xxiv

**Chapter 1.    The Alabama Sentencing Commission - History and Highlights** 1-10

**Chapter 2.    2007 Sentencing Commission Legislation** 11-22
    2007 Crime Bills that Passed 11
    2008 ASC Legislative Package 14

**Chapter 3.    Alabama Department of Corrections** 23-34
    FY07 Fiscal Review 24
    FY08 Budget Status 25
    FY08 Revenues and Projected Expenditures 25
    FY09 Budget Projections 26
    Initiatives to Address ADOC Issues and Needs 26
    Proposed Solutions 26
    ADOC Drug Treatment Programs 29
    Community Work Release and Work Centers 32
    Correctional Industry Development/Expansion 32
    Other ADOC Legislation 33
    ADOC Information Systems 34

**Chapter 4.    Expanding Punishment Options** 35-62
    Guiding Principle of Sentencing 35
    Community Corrections Programs 35
        Expansion and Enhancement Efforts 36
        Strategies for Creating Cost-Efficient and Effective Community
            Corrections Systems 37
        Improved Data Reporting for Effective Evaluation 38
        Felony Diversions – FY07 Awards & Appropriations 38
        Cost Savings by Diversion to Community Corrections 39
        Types of Programs 39
        Existing Programs 39
        Community Corrections Program Listing 40
        Community Corrections Program Listing by County 41
        Community Corrections Map 42

| | |
|---|---|
| Community Corrections Sentence | 43 |
| Front-End and Institutional Diversions | 43 |
| Felons Excluded from Consideration for Direct Sentencing to Community Corrections Programs | 44 |
| Offenders Excluded from Institutional Diversion to Community Corrections by ADOC Regulation | 44 |
| Felony Diversion and Program Reimbursement | 45 |
| Rate of Reimbursement | 45 |
| New Community Corrections Diversions by County | 47 |
| Community Corrections Program Statistics | 48 |
| Drug Courts | 49 |
| Drug Addiction and Abuse - Major Contributor to Prison Population | 49 |
| Drug Courts Working in Coordination with Community Corrections | 51 |
| Drug Courts Listing | 52 |
| Drug Courts in Process of Planning | 54 |
| Drug Courts Map | 55 |
| Alabama Board of Pardons and Paroles | 56 |
| 2007 Pardons and Paroles Statistics | 56 |
| Increase of Probation and Parole Officers Falls Short of Goal | 57 |
| Implementing the Initial Voluntary Sentencing Standards | 57 |
| Risk and Needs Assessment Tool | 58 |
| Electronic PSI Expansion | 58 |
| Transition Centers - L.I.F.E Tech | 59 |
| L.I.F.E. Tech Wetumpka | 59 |
| L.I.F.E. Tech Statistics | 60 |
| L.I.F.E. Tech Thomasville | 61 |
| Technical Violator Centers | 62 |
| **Chapter 5.    Data Drives the System** | **63-85** |
| Sentencing Standards & Worksheets Compliance Stages | 63 |
| Sentencing Worksheets Received for FY07 | 66 |
| Figure 1. Sentencing Worksheets Received | 66 |
| Figure 2. Worksheets Sentencing Events for FY07 | 67 |
| Figure 3. ASC Received Worksheets for FY07 ADOC | 67 |
| Jurisdictional Population Growth | 68 |
| Figure 4. Jurisdictional Population March 1994-2008 | 68 |
| Figure 5. ADOC Jurisdictional Year End Population | 68 |
| ADOC Definition of Jurisdictional Population | 69 |
| Figure 6. ADOC Beds | 69 |
| Habitual Felony Offenders | 70 |
| Figure 7. Habitual Felony Offenders in ADOC | 70 |
| Inmates in County Jail Awaiting Transfer to ADOC | 71 |
| Figure 8. Inmates Awaiting Transfer to ADOC | 71 |
| Figure 9. State Inmates in County Jails | 71 |
| Who is In Our Prisons - Top25 | 72 |
| Figure 10. ADOC Stock Population on September 30, 2007 | 72 |
| Figure 11. ADOC Stock Population - Offense Category | 72 |
| Most Frequent Offense at Conviction | 73 |
| Figure 12. Most Frequent Offense at Conviction – Top 10 | 73 |

Most Frequent Offense at Conviction – Top 25      74
Figure 13. Most Frequent Non-Capital Offense at Conviction – Top 25      74
Figure 14. Most Frequent Non-Capital Offense at Conviction by Offense
    Category      75
Drug Convictions      76
Figure 15. Most Frequent Drug Offenses at Conviction      76
Type of Trafficking Convictions      77
Figure 16. Most Frequent Drug Trafficking Convictions      77
Prison Admissions – Top 25      78
Figure 17. Prison Admissions for New Offenses      78
Prison Admissions for New Offenses by Offense Category      79
Figure 18. Prison Admissions for New Offenses by Offense Category      79
Prison Admissions by Type of Admission      80
Figure 19. All Prison Admissions by Type      80
Prison Releases – Top 25      81
Figure 20. Prison Releases      81
Prison Releases by Offense Category      82
Figure 21. Prison Releases by Offense Category      82
Prison Releases by Type      83
Figure 22. Prison Releases - Type of Release      83
Figure 23. Prison Releases - Type of Release by Month      84
Prison Releases by Offense Category by Type      85
Figure 24. Prison Releases by Offense Category by Type      85

**Chapter 6.**      **Timeline of Events**      87-104

This project was supported by Grant No. 04-DD-BX-1014 awarded by the Department of Justice, Office of Justice Programs. The opinions, findings, and conclusions or recommendations expressed in this publication are those of the authors and do not necessarily reflect the views of the Department of Justice.

## Acknowledgments

Successful criminal justice reform requires the hard work and unfaltering commitment of many. Alabama has been fortunate to have had the leaders from all branches of government, as well as key criminal justice officials, support the reform efforts of the Alabama Sentencing Commission and assist in having its recommendations adopted and implemented. Through their assistance and continued collaboration, there is now a united and coordinated effort to address the recurrent problems of crime that confront our state.

The Alabama Sentencing Commission brings together representatives from every area of the system involved in the decision-making process to obtain input on all aspects of criminal justice reform and the Commission's recommendations. While the membership of the Commission is governed by statute, the Commission has involved additional groups and individuals in its planning process. The Commission has sought input from additional representatives from the Bench and Bar, criminal justice agencies and departments, and those directly affected by the sentencing decision, either through membership on the Commission's Advisory Council or various committees.

The Commission and staff appreciate the support and assistance of these officials and concerned citizens to improve Alabama's Criminal Justice System. Special recognition is extended to the following individuals and organizations for lending their knowledge, expertise and assistance to this important undertaking.

Chief Justice Sue Bell Cobb
Joseph A. Colquitt, Chairman of the Sentencing Commission
Judges of the Court of Criminal Appeals
Alabama Circuit and District Judges' Associations
Governor Bob Riley and staff
Jim Main, Finance Director of the State of Alabama
The Alabama Board of Pardons and Paroles and staff: Cynthia Dillard, Eddie Cook, and Robert Oaks
Attorney General Troy King
Commissioner Richard Allen, Alabama Department of Corrections
Vernon Barnett, Chief Deputy Commissioner of the Alabama Department of Corrections
Alabama Department of Corrections, Technology Division
Administrative Office of Courts, Technology Division
Alabama Judicial College
Callie Dietz, Administrative Director of Courts and Director of Judicial College
Bob Bradford, Finance Director, Administrative Office of Courts
Leslie Jacques, Budget Manager, Administrative Office of Courts
David Williams, Administrative Office of Courts
Lela Taylor, Judicial College, Administrative Office of Courts
Victim Advocates: VOCAL, MADD, Angel House, Coalition Against Domestic Violence
The Office of Prosecution Services and the District Attorneys' Association
Legislative Reading and Research Service
Legislative Reference Service
Jeff Williams, Community Corrections Division, Department of Corrections
Dr. Tammy Meredith and Dr. John Speir, Applied Research Services, Inc.
Dr. Rick Kern, Director of the Virginia Commission on Criminal Sentencing and staff
Vera Institute of Justice
Pew Charitable Trusts
Alabama Association of Community Corrections
Maury Mitchell, Director, Criminal Justice Information Center
Alabama Lawyers' Association
The Criminal Defense Lawyers' Association
Faulkner University and Dr. Lou Harris

Alabama Sentencing
Commission Members

**Appointed by the Chief Justice of the Supreme Court**
Retired Circuit Judge Joseph A. Colquitt, Chair
Professor, University of Alabama School of Law

**Governor's Appointments**
Vernon Barnett, Chief Deputy Commissioner
Alabama Department of Corrections

Rhonda Hardegree
Victim Advocate

Stephen Nodine, Commissioner
Mobile County Commission

**Attorney General Appointment**
Rosa Davis
Chief Assistant Attorney General

**President of the Alabama District Attorneys' Association Appointment**
Eleanor I Brooks, District Attorney, 15th Judicial Circuit

**President of the Alabama Association of Circuit Court Judges' Appointments**
Circuit Judge P.B. McLauchlin, 33rd Judicial Circuit
Circuit Judge David A. Rains, 9th Judicial Circuit

**President of the Alabama Association of District Court Judges' Appointment**
District Judge Terri Bozeman Lovell, Lowndes County

**Chair of the House of the Judiciary Committee**
Representative Marcel Black, 3rd District, Colbert County

**Chair of the Senate Judiciary Committee**
Senator Rodger M. Smitherman, 18th District, Jefferson County

**Alabama Department of Corrections**
Richard Allen, Commissioner

**Alabama Board of Pardons and Paroles' Appointment**
Cynthia Dillard, Executive Director

**Appointment by the Chief Justice of the Supreme Court**
Lou Harris, D.P.A., Faulkner University

**President of the Alabama Lawyers' Association Appointment**
Joe Reed, Jr., Esquire, Montgomery

**President of the Alabama Criminal Defense Lawyers' Association Appointment**
Joel Sogol, Esquire, Tuscaloosa

Executive Committee

Retired Circuit Judge Joseph A. Colquitt, Chair
Professor, University of Alabama School of Law

Rosa Davis
Chief Assistant Attorney General

Senator Rodger M. Smitherman
18th District, Jefferson County

Advisory Council

Circuit Judge John W. Cole
10th Judicial Circuit

Eddie Cook, Associate Director
Board of Pardons and Parole

Deborah Daniels
Prison Fellowship Ministries

Doris Dease
Victim Advocate

Denis Devane
Shepherd's Fold

Chief James Henderson
Clanton Police Department

Kent Hunt, Associate Commissioner
Alabama Department of Mental Health and Mental Retardation

Representative John F. Knight
Alabama House of Representatives

Shelly Linderman
VOCAL Angel House

Retired Justice Hugh Maddox
Alabama Supreme Court

J. Christopher Murphy, Director
Alabama Department of Public Safety

Sheriff Wally Olson
Dale County Sheriff's Office

David Horn, President
Alabama Community Corrections Association
Director, Shelby County Community Corrections

Buddy Sharpless, Executive Director
Association of County Commissions

Chaplin Adolph South
Tuscaloosa, AL

Walter Wood, Executive Director
Alabama Department of Youth Services

| | |
|---|---|
| Commission Staff | Lynda Flynt, Executive Director |
| | Rosa Davis, Chief Assistant Attorney General |
| | Mary Duncan, Administrative Assistant |
| | Melisa Morrison, Research Analyst |
| | Paul Sullivan, Sentencing Worksheets Specialist |
| | Christina Van Der Hulst, Legal Research |
| | Bennet Wright, Statistician |

| | |
|---|---|
| Standards Committee | Rosa Davis, Chair<br>Chief Assistant Attorney General |
| | Eleanor I. Brooks, District Attorney<br>15th Judicial Circuit |
| | Cynthia Dillard, Director<br>Board of Pardons and Parole |
| | Joel Sogol, Esquire<br>Tuscaloosa |
| | Becki Goggins, Uniform Crime Reporting Program Manager<br>Criminal Justice Information Center |
| | William R. Hill, Jr., Esquire |
| | Circuit Judge P. B. McLauchlin<br>33rd Judicial Circuit |
| | Circuit Judge David A. Rains<br>9th Judicial Circuit |
| | Joe Reed, Jr., Esquire<br>Faulk & Reed, L.L.P. |
| | Miriam Shehane, Executive Director<br>VOCAL |
| | Tommy Smith, District Attorney<br>6th Judicial Circuit |
| | Circuit Judge Virginia Vinson<br>10th Judicial Circuit - Birmingham |
| | Bob Williams, Public Defender<br>Shelby County |

| | |
|---|---|
| Legislative Committee | Lou Harris, D.P.A., Chair<br>Faulkner University |
| | Nick Abbett, District Attorney<br>Opelika |
| | Vernon Barnett, Chief Deputy Commissioner<br>Alabama Department of Corrections |
| | Sharon Bivens, Legislative Fiscal Analyst<br>Legislative Fiscal Office |
| | Representative Marcel Black, Chair<br>House Judiciary Committee |
| | Eleanor I. Brooks, District Attorney<br>15th Judicial Circuit |
| | Presiding Circuit Judge John B. Bush<br>19th Judicial Circuit |
| | Cynthia Dillard, Director<br>Board of Pardons and Paroles |
| | Lynda Flynt, Executive Director<br>Alabama Sentencing Commission |
| | Beck Goggins, Uniform Crime Reporting Program Manager<br>Criminal Justice Information Center |
| | Rhonda Hardegree<br>Victim Advocate |
| | Retired Circuit Judge Robert M. Harper<br>Haygood, Cleveland, Pierce, Mattson & Thompson<br>Lee County |
| | Circuit Judge James E. Hill<br>30th Judicial Circuit |
| | Kent Hunt, Associate Commissioner<br>Alabama Department of Mental Health and Mental Retardation |
| | Representative John F. Knight<br>Alabama House of Representatives |
| | Stacey Neeley, Director<br>DeKalb County Community Punishment & Corrections Authority, Inc. |
| | Don Parker, Director<br>Montgomery County Community Punishment & Corrections Authority, Inc. |
| | Marty Ramsay, Director<br>Court Services Division, Administrative Office of Courts |
| | Joe Reed, Jr., Esquire<br>Faulk & Reed L.L.P. |
| | Buddy Sharpless, Executive Director<br>Association of County Commissions |

Senator Rodger M. Smitherman, Chair
Senate Judiciary Committee

Joel Sogol, Esquire
Tuscaloosa

Kim Ziglar, General Counsel
Crime Victims Compensation

Cooperative Community
Alternative Sentencing
Project

Statewide Steering
Committee

Chief Justice Sue Bell Cobb, Co-Chair
Supreme Court of Alabama

Rosa Davis, Co-Chair
Chief Assistant Attorney General

Lindsey Allison, County Commissioner
Shelby County

Vernon Barnett, Chief Deputy Commissioner
Alabama Department of Corrections

Art Baylor, Chief of Police
Montgomery Police Department

District Judge Michael Bellamy
26th Judicial Circuit

Representative Barbara Boyd
32nd District, Calhoun and Talladega Counties

Eleanor I. Brooks, District Attorney
15th Judicial Circuit

Foster Cook, Director
Treatment Alternative to Street Crime (TASC), Jefferson County

Deborah Daniels
Prison Fellowship Ministries

Cynthia Dillard, Director
Board of Pardons and Paroles

Circuit Judge Clark Hall
16th Judicial Circuit

Kent Hunt, Associate Commissioner
Alabama Department of Mental Health and Mental Retardation

David Horn, President
Alabama Community Corrections Association
Director, Shelby County Community Corrections

Retired District Judge Orson "Pete" Johnson
10th Judicial Circuit - Birmingham

Rebecca Johnson, Deputy Director
Montgomery County Community Corrections Program

Lee Knowles, Esquire
Geneva County

Stacy Neely, Director
DeKalb County Community Punishment & Corrections Authority, Inc.
Judy Newcomb, District Attorney
28th Judicial Circuit

Marty Ramsay, Director
Court Services Division, Administrative Office of Courts

Circuit Judge Philip Reich II
36th Judicial Circuit

Buddy Sharpless, Executive Director
Alabama Association of County Commissions

Miriam Shehane, Executive Director
VOCAL

Jeff Williams, Director
Community Corrections Division of the Alabama Department of Corrections

Rev. Jiles Williams, County Commissioner
Montgomery County

| | |
|---|---|
| Uniform Sentencing Order Committee | Rosa Davis, Chair<br>Chief Assistant Attorney General |
| | Nick Abbott, District Attorney<br>37th Judicial Circuit |
| | Anne Adams, Special Counsel to the Commissioner<br>Alabama Department of Corrections |
| | Eleanor I. Brooks, District Attorney<br>15th Judicial Circuit |
| | Vaughn Branch, Program Manager<br>Treatment Alternative to Street Crime (TASC), Jefferson County |

Circuit Judge Scott Donaldson
6th Judicial Circuit

Brandon Falls, Deputy District Attorney
10th Judicial Circuit - Jefferson

Greg Gambril, District Attorney
22nd Judicial Circuit

Corinne Hurst, Circuit Clerk
Lee County

Circuit Judge P.B. McLauchlin
33rd Judicial Circuit
Circuit Judge Philip Reich II
36th Judicial Circuit

Melissa Rittenour, Circuit Clerk
Montgomery County

Joel Sogol, Esquire
Tuscaloosa

Circuit Judge Virginia Vinson
10th Judicial Circuit - Birmingham

Bob Williams, Public Defender
Shelby County

Nathan Wilson, Staff Attorney
Administrative Office of Courts

# Alabama Board of Pardons and Paroles

**Cynthia Dillard New Director of Board of Pardons and Paroles**

2007 was an active year for the Board of Pardons and Paroles, with the retirement of Executive Director William C. Segrest on January 1, 2007, and subsequent appointment of Cynthia S. Dillard as the new Director, and appointment of a new Board Chairman, William W. Wynne, on July 1, 2007, replacing former Chair, Sidney T. Williams.

**9,959 Parolees and 49,137 Probationers Supervised During FY07**

During FY 2007, there were 6,640 offenders considered for parole, 67% of which were denied and 9,959 parolees under supervision (including those under both parole and probation supervision). Comparatively, there were many more offenders under probation supervision – 48,903 or 49,137 counting those under both probation and parole supervision, supervised by 297 officers, resulting in high caseloads.

## 2007 Pardons and Paroles Statistics

| | | | |
|---|---|---|---|
| Paroles Considered | 6,640 | **Probationers** Supervised | 48,903 |
| Paroles Denied | 4,453 (67%) | | |
| Paroles Granted | 2,187 (33%) | Probation Revoked | 2,675 (5.5%) |
| Parolees Supervised | 9,725 | Technical Violations | 1,337 |
| Parole Revoked | 870 (9%) | New Offense | 675 |
| Technical | 378 | Technical and New Offense | 663 |
| New Offense | 207 | | |
| Technical and New Offense | 285 | | |
| | | | |
| **Both Parole and Probation** | 234 | **Pardons Considered** | 805 |
| Revoked | 26 (11%) | Pardons Denied | 116 (14%) |
| Revoked New Offense | 4 | Pardons Granted | 689 (86%) |
| Revoked Technical | 13 | | |
| Technical and New Offense | 9 | | |
| | | | |
| Field Offices | 64 | | |
| Supervising Officers | 297 | | |
| Caseload Per Officer | **198** | | |
| Completed Investigations | 59,459 | | |
| Voter's Rights Restorations Granted | 1,709 | | |

### Increase of Probation and Parole Officers Falls Short of Goal

Following a growth trend that began several years ago, during FY07, probation and parole officers supervised a total of 58,862 probationers and/or parolees. A snapshot on September 30, 2007 showed an average caseload of 155 per officer based on the number of offenders under supervision (46,080) and 297 supervising officers. Last year's average caseload of 159 per officer has only been reduced by 4 cases per officer. As a result of the limited number of new recruits and the increased attrition rate, Alabama not only continues to be substantially above the national and southeastern average, but has not made significant progress towards achieving the average caseload benchmark of 100 that has been recommended by the Sentencing Commission.

**Caseloads of Officers Not Significantly Lowered**

As noted in the Commission's 2007 report, more officers and support staff are needed to adequately supervise the increased number of probationers and parolees. Beginning in FY06, 60 new officers were hired, providing an all time high of 387 supervising officers, which initiated a reduction in the supervised caseload to 159 cases per officer. Only 24 additional officers were hired in FY07, which, when combined with the officers lost due to attrition, resulted in a decrease of 90 officers or 23% reduction.

**Only 24 Additional Officers Hired in 2007 - Overall Decrease of 90 Officers**

Although the Sentencing Commission recommended hiring 60 additional officers each year for three years until the average caseload fell to below 100, because of insufficient funds and the decrease in probation officers last year, the timeline for achieving this goal must be recalculated. Considering the current number of offenders on probation or parole supervision, the Sentencing Commission recommends an increase of 60 supervising officers for FY08, FY09, and FY10 for a net gain of 180 officers to achieve caseloads of 100 per officer.

### Implementing the Initial Voluntary Sentencing Standards

Since implementation of the initial voluntary sentencing standards in 2006, many judges have designated their probation officer as the designated sentencing worksheet preparer. In addition to the added responsibility of completion of the sentencing worksheets, in compliance with §13A-5-5, *Code of Alabama* 1975, the probation officer must also complete an electronic pre-sentence or post-sentence investigation report (E-PSI) on every felony offender. While information contained in the E-PSIs are essential for informed sentencing and implementation of evidence-based practices which will benefit the entire criminal justice system, this additional task imposed by Act 2006-218 was an unfunded mandate on the Board of Pardons and Paroles, which has added considerably to the administrative workload of probation and parole officers.

**Requirement of E-PSI for All Felony Convictions, While Necessary, Increased Workload of Probation Officers and Staff**

The Board of Pardons and Paroles and staff are to be commended for their assistance to the Sentencing Commission and courts through their efficient completion of E-PSIs, conducting thorough criminal history checks, and implementation of the sentencing standards. Pardons and Paroles staff has provided invaluable support in the successful implementation of the

initial sentencing standards, as well as the Commission's efforts to expand and improve community sentencing alternatives. The Executive Director and administrative staff continue to actively participate in educational and cooperative endeavors on such matters as the proper application of the sentencing standards, utilization of the electronic worksheets, shared data programs, and the need for a uniform sentencing order and needs and risk assessment instruments.

## Risk and Needs Assessment Tool

**Board of Pardons and Paroles Shares Risk and Needs Assessment with the Sentencing Commission**

The Alabama Sentencing Commission, in conjunction with the Association of Community of Corrections and the Department of Corrections, has begun review of risk and needs assessment instruments to determine if a uniform assessment tool could be adopted and utilized for offenders at various stages in the criminal justice system. To assist in this endeavor, the Board of Pardons and Paroles recently approved a request from the Sentencing Commission to provide copies of the Risk and Needs Assessment instruments developed for Pardons and Paroles by the National Council on Crime and Delinquency. These instruments are used by the Board to plan probation requirements and determine parole eligibility. In addition, the "needs" instrument is used to identify areas in which offenders must improve to lead a crime free life and to collect offender specific data for use in determining the effectiveness of sentencing policies and treatment programs.

## Electronic PSI Expansion

**11,616 E-PSIs Completed in FY07**

With the passage of Act 2006-218, effective March 10, 2006, pre-sentence or post-sentence reports must be completed and filed in an electronic format by probation officers on all convicted felony offenders. These reports contain information essential to the supervision of probationers and the classification of prison-bound offenders, and are a rich data source for future analyses of the offender population on probation, serving time in prison or in an alternative punishment program. The information contained in these reports includes offender demographics (age, personal and family history, education and military history, criminal history, etc.), as well as offense demographics (details of the offense, age, sex and race of the victim, relationship of the offender to the victim etc). In FY07, probation services completed 11,616 electronic PSI's, compared to the 18,979 people convicted of felony offenses in FY07. Probation and parole officers also completed 4,419 youthful offender investigations in FY07, which included offenders that were denied youthful offender status.

While the completion of an E-PSI on every convicted felony offender is a major advancement toward more informed sentencing and supervision (as well as the compilation of vital demographic and criminal history information), this project comes with costs. As an unfunded mandate for Pardons and Paroles, it has exacerbated the workload of an already overburdened and limited pool of supervising officers. The increased duties incurred with this project greatly increased the need for more supervising officers.

### Transition Centers – L.I.F.E. Tech

Alabama now has two transition centers operated by the Board of Pardons and Paroles: one for females located in Wetumpka (the former Tarwater Mental Health Center), and one for males located in Thomasville, Alabama. "L.I.F.E. Tech" (Life Skills Influenced by Freedom and Education) are programs designed for parolees and probationers who are in need of education, vocational training, treatment, counseling, and supervision services in a secure setting, to successfully transition back into society.

**Two Transition Centers Operating**

The Alabama Sentencing Commission recognizes the importance of transition centers to assist in the reintegration of offenders back into the community and to provide an important rung in establishing a true continuum of sanctions in Alabama. These transition centers, originally designed as a stepping stone from prison to the free world, are now used not only for that purpose, but also as a "last step" before prison for some offenders for whom every other avenue has failed.

#### L.I.F.E. Tech Wetumpka

L.I.F.E. Tech/Wetumpka, is a 200 bed facility for female probationers and parolees that has been in operation since April 12, 2004. During this four year period, 1,335 women have been served, with 780 successfully completing the program. There have been 445 Technical Training Certificates awarded, 175 GED awards, and 97 Alabama Certified Worker Certificates awarded. In 2005 and 2006, the L.I.F.E Tech adult education program was ranked number one in the State, and in 2005 received the Governor's Partners in Progress Workforce Development Award. L.I.F.E. Tech boasts of a recidivism rate of 4.1 %, which is the measure of graduates that have been reconvicted for an offense since leaving the center. This compares very favorably with a recidivism rate of over 25% for those who are released without the benefits of the program

**200 Bed Facility for Women Proves Successful**

The women's facility, designed to help reduce the crowded conditions at Tutwiler Prison, as well as to assist women to successfully transition from prison to the free world, originally focused on accepting incarcerated women who were not quite ready for traditional parole. There are currently more than twice as many probationers than parolees who are program participates, which is a reverse trend from the residents that were originally admitted. While the facility has notified judges that it will accept probationers to the program, concerns have been raised that this will encourage "net widening," focusing on those offenders that would be otherwise sentenced to probation, rather than those that were prison-bound. In addition, of the 275 noncompleters noted in statistics compiled by L.I.F.E. Tech on March 26, 2008, the largest group of failures (53%) were from the probation category.

**780 Women have Successfully Completed L.I.F.E. Tech Program**

| | Completed Program | Failed to Complete | Current Residents | Total |
|---|---|---|---|---|
| Parolees | 422 | 129 | 47 | 598 |
| Probationers | 358 | 146 | 117 | 621 |
| EOS | | 89 | | 89 |
| Medical | | 27 | | 27 |
| Total | 780 | 391 | 164 | 1,335 |

**Pardons and Paroles Boasts 4.1 Recidivism Rate**

As the chart below reflects, while in the past the majority of the L.I.F.E. Tech Wetumpka residents have been 2:1 parolees, that ratio has now changed to more than 3:1 probationers. While 95% of the residents from April 2004 through September 2004 were parolees, this category decreased to 49.7% in FY 05, to 48% in FY 06, and 22% in FY 07. It is recommended that the Board of Paroles, in conjunction with the Department of Corrections, conduct a thorough study of the women incarcerated at Tutwiler to find those offenders who could benefit from the intensive L.I.F.E. Tech programs to further ease the crowded conditions at that facility and to provide released women with the skills necessary to make it in the free world.

**More Probationers in L.I.F.E. Tech Wetumpka Now Than Parolees**

**The Male Facility L.I.F.E. Tech Thomasville Serves Primarily Parolees**

## L.I.F.E. Tech – Statistics

|  | Wetumpka (females) | Thomasville (males) |
|---|---|---|
| Total Residents | 1,335 | 1,010 |
| Parolees | 676 | 958 |
| Probationers | 659 | 52 |
| Completers | 780 | 544 |
| Parolees | 422 | 533 |
| Probationers | 358 | 11 |
| Non Completers | 391 | 241 |
| Parolees | 129 | 151 |
| Probationers | 146 | 8 |
| *EOS | 89 | 50 |
| *Medical | 27 | 32 |
| Total Active Residents | 164 | 216 |
| Active Parolees | 47 | 186 |
| Active Probationers | 117 | 30 |
| Revocations | 32* | 103 |
| Parolees Revoked | 25 | 103 |
| Probationers Revoked | 7 | |

### L.I.F.E. Tech Thomasville

The re-entry treatment facility for male inmates at Thomasville, a 300 bed facility (expected to be able to accommodate 600 male inmates a year) became operational April 2, 2006 and has a current enrollment of 216. Patterned after the programs available at the Wetumpka facility for women, the Thomasville facility, working in collaboration with several state agencies and faith-based organizations, provides treatment, vocational and life skills training to transition male inmates back into the community.

**Male Transition Center Opens April 2006**

Residents of the center provide community service work for the City of Thomasville and the Clarke County area and must participate in a demanding transition program. Each parolee assigned to the center is required to meet obligations to participate in treatment, vocational and life skills training, and also work at the center. The L.I.F.E. Tech program, operated in partnership with the Alabama Southern Community College, trains parolees for successful re-entry into the community and the workforce. Alabama Southern provides a 15-week educational component focusing on high-demand programs such as welding, electricity, building construction, inventory clerk, landscape maintenance and building maintenance.

**Alabama Southern Community College Partners with L.I.F.E. Tech to Train Parolees**

The male residents at the Thomasville transition center are primarily those who have been granted parole, and as a condition of parole are required to successfully complete the L.I.F.E. Tech program. These inmates are found not to be suitable for regular parole, but in need of transition services before being released into the community under general supervision. The program consists of an 11-week intensive treatment phase followed by the 15-week educational component. While the recidivism rate of the early graduates is not as successful as that of the women, it is still lower than those released without the benefits of the program.

**Program Consists of 11-Week Intensive Treatment and 15-Week Educational Component**

|  | Completed Program * | Failed to Complete | Current Residents | Total |
|---|---|---|---|---|
| Parolees | 533 | 103 | 186 | 958 |
| Probationers | 11 | --- | 30 | 52 |
| Currently Jailed |  | 19 |  |  |
| Admin. Termination |  | 7 |  |  |
| EOS |  | 50 |  |  |
| Medical |  | 32 |  |  |
| Transferred |  | 30 |  |  |
| Total | 544* | 241 | 216 | 1,010 |

*3 additional completed treatment program only

Alabama is now providing inmates a better opportunity to succeed - something more than $10 and a bus ticket are needed to ensure a successful transition back into society. Alabama must continue to work to provide a true continuum of punishment options, including more opportunities for successful re-entry into the free world after prison. The safety of the public depends on the successful re-entry of these individuals. The L.I.F.E Tech programs must continue to expand to offer successful re-entry to all

**Alabama Begins to Focus on Re-Entry for Effective Corrections**

felony offenders who can take advantage of these opportunities before being released from prison.

**$3 Million Per Year Additional Funding Needed to Continue Existing Transition Centers**

To enable the two existing transition centers to continue to operate during FY08 and FY09, the Board of Pardons and Paroles must have sufficient funding for 3 additional employees, and additional funding of $3 million per year for employees and capital improvements..

### Technical Violator Centers

In FY07, more than 378 offenders were returned to prison for technical violations of parole (no new offense committed) and 1,337 for technical violations of probation. Technical violations include violating a condition of parole or probation other than the commission of a new offense. These violations are for failure to abide by conditions of supervision such as failure to report to a parole or probation officer in a timely fashion, failing drug tests, violations of curfew, late reporting, failing to notify of address change, etc. The violations indicate an inability to comply with rules and a lack of structure in the lives of the offenders and are often more indicative of the offender's danger to him/herself than to the community. To address these issues, Alabama should join the ranks of the other states that have implemented technical violator centers with special programs for these types of offenders. If Alabama had technical violation centers operational last year, prison admissions to ADOC could have been reduced by the 1,715 parolees or probationers who were revoked to serve time in prison for committing technical violations.

**Estimated $5.3 Million Needed to Establish Technical Violator Centers**

The Sentencing Commission continues to recommend the creation of Technical Violator Centers in Alabama, not only because of prison crowding, but also because the needs of these offenders can be more effectively and efficiently addressed in centers aimed specifically at the problems these offenders face. Again, this is an issue of public safety. A swift and sure response to violations could be delivered through a 60 to 90 day program at a technical violator center, without resorting to the use of scarce prison resources for these offenders. The Board of Pardons and Paroles is considering several sites for the creation of Alabama's first Technical Violator Center. The cost projection for this project is $5.3 million for the first year.

Who is in our Prisons - Top25

The table below shows the most serious offense that an offender is currently serving a sentence under ADOC jurisdiction. Over half (56 percent) of offenders are currently serving sentences for one of the top 8 offenses listed below, and nearly a quarter (24%) of offenders are serving drug offense sentences. The pie chart shown in figure 11 illustrates that, of the Top 25 offenses in the table, personal offenders make up the majority of those currently serving sentences.

Figure 10.

### Stock Population on September 30, 2007

**Over 50% of the Current ADOC Population is Comprised of One of the Top 7 Offenses**

| Offense | | Count |
|---|---|---|
| Murder | 1 | 3,941 |
| Robbery 1st | 2 | 3,527 |
| Possession of Controlled Substance | 3 | 2,341 |
| Distribution of Controlled Substance | 4 | 1,709 |
| Burglary 3rd | 5 | 1,439 |
| Theft of Property 1st | 6 | 1,152 |
| Burglary 1st | 7 | 1,102 |
| Rape 1st | 8 | 1,087 |
| Robbery 3rd | 9 | 847 |
| Trafficking Drugs | 10 | 828 |
| Manslaughter | 11 | 724 |
| Possess Marijuana 1st | 12 | 663 |
| Felony DUI | 13 | 621 |
| Poss Forged Instrument 2nd | 14 | 572 |
| Receiving Stolen Property 1st | 15 | 558 |
| Assault 2nd | 16 | 529 |
| Assault 1st | 17 | 524 |
| Theft of Property 2nd | 18 | 522 |
| Sodomy 1st | 19 | 512 |
| Attempted Murder | 20 | 509 |
| Robbery 2nd | 21 | 506 |
| Breaking/Entering a Vehicle | 22 | 497 |
| Sexual Abuse 1st | 23 | 462 |
| Burglary 2nd | 24 | 451 |
| Rape 2nd | 25 | 365 |
| **Top 25 Offenses** | | **25,988** |
| Other Offenses | | 3,247 |
| **Total Stock Population** | | **29,235** |

Figure 11.

### Stock Population Top 25 Offense Category



ALABAMA SENTENCING COMMISSION, 2008

**Most Frequent Offense at Conviction**

From October 1, 2002 through September 30, 2007, the top ten offenses at conviction are listed below. Possession of a Controlled Substance convictions far outpace the other conviction offenses on this list – the number of possession convictions is more than three times than that of the second most convicted offense on the list (Theft of Property 2nd). Drug and Property offenses comprise the top 8 positions in the list (93%), while personal offense category inclusions are Robbery 1st (# 9) and Assault 2nd (# 10) and comprise only 7% of the Top10 list.

**Drug and Property Offenses Account for 93% of the Top10 Offenses at Conviction**

Figure 12.

**Most Frequent Offense at Conviction - Top10**
**October 1, 2002 - September 30, 2007**



| Offense | Count |
|---|---|
| Possession of Controlled Susbtance | 21,892 |
| Burglary 3rd | 5,508 |
| Theft of Property 2nd | 5,284 |
| Theft of Property 1st | 4,599 |
| Distribution of Controlled Substance | 4,490 |
| Possession Marijuana 1st | 4,488 |
| Felony DUI | 4,451 |
| Poss Forged Instrument 2nd | 4,384 |
| Robbery 1st | 2,231 |
| Assault 2nd | 1,998 |

### Most Frequent Offense at Conviction - Top 25

**The Number of Possession Convictions is More Than Four Times That of the #2 Most Frequently Occurring Conviction Offense (Burglary 3rd).**

Drug and felony DUI convictions continue to outpace both property and personal offense categories in the top 25 crimes of conviction. Drug and felony DUI convictions account for 50% of the convictions in the top 25, while property and personal convictions were responsible for 38% and 11% respectively. Possession of Controlled Substance convictions constitute nearly a third (31%) of top 25 convictions and over a quarter (26%) of all convictions. However, felony DUI convictions fell sharply from the previous two years, likely as a result of the amended felony DUI statute requiring that all prior DUI convictions used to reach the felony DUI threshold are within the previous five years. Felony DUI convictions dropped 349 convictions (39%) from the 2006 number and 428 convictions (44%) from the 2005 level.

Figure 13.

#### Most Frequent Non-Capital Offense at Conviction
#### October 1, 2004 - September 30, 2007

|  | | FY05 | | FY06 | | FY07 |
|---|---|---|---|---|---|---|
| Possession of Controlled Substance | 1 | 4,469 | 1 | 4,917 | 1 | 4,983 |
| Burglary 3rd | 2 | 1,148 | 2 | 1,195 | 2 | 1,237 |
| Theft of Property 2nd | 3 | 981 | 3 | 1,064 | 3 | 1,083 |
| Theft of Property 1st | 8 | 859 | 8 | 867 | 4 | 965 |
| Distribution of Controlled Substance | 7 | 915 | 4 | 952 | 5 | 955 |
| Possession Marijuana 1st | 4 | 977 | 7 | 870 | 6 | 923 |
| Poss Forged Instrument 2nd | T5 | 974 | 6 | 880 | 7 | 871 |
| Felony DUI | T5 | 974 | 5 | 895 | 8 | 546 |
| Robbery 1st | 10 | 373 | 9 | 466 | 9 | 523 |
| Assault 2nd | 9 | 398 | 11 | 361 | 10 | 436 |
| Receiving Stolen Property 2nd | 11 | 360 | 10 | 393 | 11 | 366 |
| Receiving Stolen Property 1st | 14 | 317 | 13 | 326 | 12 | 360 |
| Breaking/Entering a Vehicle | 13 | 337 | 12 | 328 | 13 | 352 |
| Trafficking Drugs | 15 | 299 | 16 | 276 | 14 | 331 |
| Fraud/Illegal Use Debit/Credit Card | 18 | 250 | 15 | 301 | 15 | 290 |
| Robbery 3rd | 16 | 287 | 14 | 314 | 16 | 282 |
| Forgery 2nd | 17 | 285 | 18 | 253 | 17 | 279 |
| Obstruct Justice-False Identity | 25 | 129 | 19 | 194 | 18 | 227 |
| Manufacturing Controlled Substance 2nd | 12 | 359 | 17 | 263 | 19 | 192 |
| Assault 1st | | 125 | | 132 | 20 | 180 |
| Murder | | 113 | 24 | 142 | 21 | 168 |
| Sexual Abuse 1st | 21 | 151 | 22 | 166 | 22 | 158 |
| Burglary 2nd | 22 | 149 | 21 | 167 | 23 | 147 |
| Manufacturing Controlled Substance 1st | 19 | 227 | 20 | 181 | 24 | 145 |
| Community Notification Act-Moving Notice | | 53 | | 71 | 25 | 132 |
| Attempt - Possession of Controlled Substance | 20 | 157 | 25 | 137 | | 129 |
| Manslaughter | 24 | 132 | | 112 | | 113 |
| Burglary 1st | 23 | 147 | 23 | 154 | | 98 |
| **Top 25 Offenses** | | **15,654** | | **16,062** | | **16,131** |
| Other Offenses | | 2,435 | | 2,774 | | 2,848 |
| **Total Most Serious Felony Offense Convictions** | | **18,089** | | **18,836** | | **18,979** |

### Type of Most Frequent Offense at Conviction

From fiscal 2005 through fiscal year 2007, small shifts occurred in the distribution of convictions by offense type. Drug convictions dropped to 44 percent in fiscal year 2007 from 47 percent the previous fiscal year and 48 percent in fiscal year 2005.

**Drug Convictions Have Dropped 4% from FY05**

Figure 14.

### Most Frequent Non-Capital Offense at Conviction
### Offense Category
### October 1, 2004 - September 30, 2007



FY05



FY06



FY07

### Drug Convictions

Felony DUI convictions
have dropped 39 percent
from 2006

During this three year period, the largest movements of drug offenses involve Felony DUI and Manufacturing convictions. Both Felony DUI and Manufacturing offenses dropped considerably during this time period. As mentioned earlier, Felony DUI convictions fell sharply in fiscal year 2007 possibly due to an amendment changing requirements for prior DUI convictions. Manufacturing Controlled Substances I and II convictions dropped 47 percent and 36 percent, respectively, from fiscal year 2005 levels.

Figure 15.

### Most Frequent Offense at Conviction
### Drug Offenses
### October 1, 2004 - September 30, 2007

|  | | FY05 | | FY06 | | FY07 |
|---|---|---|---|---|---|---|
| Possession of Controlled Substance | 1 | 4469 | 1 | 4917 | 1 | 4983 |
| Distribution of Controlled Substance | 4 | 915 | 2 | 952 | 2 | 955 |
| Possession Marijuana 1st | 2 | 977 | 4 | 870 | 3 | 923 |
| Felony DUI | 3 | 974 | 3 | 895 | 4 | 546 |
| Trafficking Drugs | 6 | 299 | 5 | 276 | 5 | 331 |
| Manufacturing Controlled Substance 2nd | 5 | 359 | 6 | 263 | 6 | 192 |
| Manufacturing Controlled Substance 1st | 7 | 227 | 7 | 181 | 7 | 145 |
| Attempt - Possession of Controlled Substance | 8 | 157 | 8 | 137 | 8 | 129 |
| | | | | | | |
| Total Drug Offenses | | 8,377 | | 8,491 | | 8,204 |
| | | | | | | |
| Other Offenses | | 179 | | 201 | | 147 |
| | | | | | | |
| Total Most Serious Felony Offense Convictions | | 8,556 | | 8,692 | | 8,351 |

**Type of Trafficking Convictions**

Trafficking Cocaine convictions increased by 34 convictions in fiscal year 2007 from the previous fiscal year, becoming the most frequent trafficking offense. Trafficking Methamphetamine increased 21 convictions becoming the second most frequently occurring trafficking offense, while Trafficking Marijuana dropped 22 convictions and fell from the number one spot down to number three on this list.

**Trafficking Cocaine Convictions Increased by 34 and Trafficking Methamphetamine Convictions Increased by 21 From 2006**

Figure 16.

### Most Frequent Trafficking Convictions
### Drug Type - Top5
### October 1, 2004 - September 30, 2007

|  | FY05 | FY06 |  | FY07 |
|---|---|---|---|---|
| Trafficking - Cocaine | 84 | 77 | 1 | 111 |
| Trafficking - Methamphetamine | 72 | 71 | 2 | 92 |
| Trafficking - Marijuana | 86 | 83 | 3 | 61 |
| Trafficking - Illegal Drugs | 47 | 36 | 4 | 50 |
| Other | 10 | 9 | 5 | 17 |
| **Total Most Serious Felony Offense** |  |  |  |  |
| **Convictions for Trafficking** | **299** | **276** |  | **331** |

### Prison Admissions - Top 25

**DUI Admissions Have Dropped 40 Percent Since FY05**

Jurisdictional prison admissions for new offenses to ADOC increased by 1 percent in 2007. The chart below shows the top 25 offenses responsible for prison admissions for the past 3 years. The top 3 offenses in the chart (possession of a controlled substance, distribution of a controlled substance, and burglary 3rd) have remained in the same order for the past three years and account for almost one-third (31 percent) of all prison admissions despite distribution admissions falling 9% from the previous fiscal year. The largest numeric drop in 2007 prison admissions was Felony DUI offenses. The change in the Felony DUI law contributed to lower admissions from previous years – 2007 admissions are down 126 from last year and 226 since 2005. Manufacturing of controlled substance 1st and 2nd offenses fell out of the top 25 list after being in the top 20 in previous years.

Figure 17.

### Prison Admissions for New Offenses
### October 1, 2004 - September 30, 2007

**Largest Increase was Robbery 1st Admissions**

**Largest Decrease was Felony DUI Admissions**

|  | FY 2005 | | FY 2006 | | FY 2007 | |
|---|---|---|---|---|---|---|
| Possession of Controlled Substance | 1 | 1,216 | 1 | 1,334 | 1 | 1,402 |
| Distribution of Controlled Substance | 2 | 702 | 2 | 716 | 2 | 653 |
| Burglary 3rd | 3 | 606 | 3 | 593 | 3 | 629 |
| Robbery 1st | 5 | 435 | 4 | 544 | 4 | 617 |
| Theft of Property 1st | 6 | 432 | 6 | 408 | 5 | 398 |
| Poss Marijuana 1st | 7 | 371 | 8 | 317 | 6 | 368 |
| Felony DUI | 4 | 569 | 5 | 469 | 7 | 343 |
| Theft of Property 2nd | 8 | 310 | 7 | 319 | 8 | 294 |
| Poss Forged Instrument 2nd | 9 | 271 | 10 | 249 | 9 | 275 |
| Murder | 17 | 157 | 12 | 207 | 10 | 241 |
| Trafficking Drugs | 10 | 228 | 9 | 272 | 11 | 228 |
| Robbery 3rd | 12 | 201 | 11 | 218 | T12 | 214 |
| Assault 1st | 11 | 214 | 13 | 180 | T12 | 214 |
| Receiving Stolen Property 1st | 13 | 187 | 14 | 177 | 14 | 206 |
| Breaking/Entering a Vehicle | 14 | 179 | 15 | 155 | 15 | 193 |
| Burglary 1st | 16 | 161 | 17 | 148 | 16 | 157 |
| Robbery 2nd | 21 | 119 | 18 | 133 | 17 | 140 |
| Assault 1st | 25 | 85 |  | 91 | 18 | 138 |
| Burglary 2nd | 19 | 127 | 19 | 130 | 19 | 117 |
| Receiving Stolen Property 2nd | 23 | 107 | 16 | 150 | 20 | 107 |
| Poss Fraud Use of Credit/Debit Card |  | 84 |  | 68 | 21 | 104 |
| Sexual Abuse 1st | 24 | 102 | T21 | 110 | 22 | 101 |
| Forgery 2nd | 20 | 122 | 25 | 105 | 23 | 97 |
| Sex Offender-Fail to Register |  | 16 |  | 65 | 24 | 94 |
| Rape 2nd |  | 84 | T21 | 110 | 25 | 91 |
| Manufacturing of Controlled Substance 2nd | 15 | 171 | 20 | 112 |  | 89 |
| Manufacturing of Controlled Substance 1st | 18 | 145 | 24 | 106 |  | 88 |
| Manslaughter | 22 | 117 | 23 | 107 |  | 86 |
| **Top 25 Offenses** |  | 7,334 |  | 7,369 |  | 7,421 |
| Other Offenses |  | 952 |  | 1,055 |  | 1,127 |
| **Total Prison Admissions for New Offenses** |  | 8,286 |  | 8,424 |  | 8,548 |

**Prison Admissions for New Offenses by Offense Category**

Jurisdictional prison admission for new offenses saw no major shifts in 2007. Property and personal admissions increased 9 percent and 2 percent respectively, while drug admissions fell 5 percent. The drugs category continues to account for the largest portion of admissions (37 percent), but this is down from 41 percent in 2005 and 40 percent last year.

**Property Offense
Admissions Rose 9
Percent in 2007**

Figure 18.





**Drug Offense Admissions
Show Slight Decrease
From FY05 and FY06**





Prison Admissions by Type of Admission

**The Distribution of Prison Admission Types Remains Unchanged from 2006**

The distribution of types of prison admissions in 2007 is identical to the distribution in 2006, and varies only slightly from that of 2005. Split sentence and new court commitments account for nearly 75 percent of admissions while parole and probation revocations account for almost 25 percent of admissions.

Figure 19.

### Prison Admissions (all admissions)
### Type
### October 1, 2004 - September 30, 2007



FY05



FY06



FY07

**Prison Releases - Top 25**

Total releases from ADOC dropped 2 percent from the fiscal year 2006 level, but have increased 7 percent from fiscal year 2005. Of the top 25 release offenses in 2007, 15 decreased from 2006 levels. The largest drop were releases for Theft of Property 2nd offenses which fell 32 percent and 173 releases from last year. The largest jump in releases was Possession of Controlled Substance releases climbing 157 releases, and 9 percent, from last year's numbers and 17 percent since 2005. Possession of Controlled Substance releases accounted for 1 out of every 6 (17 percent) releases in 2007 and totaled more than the next two offenses (Distribution of Controlled Substance and Robbery 1st) combined.

**Drug Possession and Distribution Releases Account for Over One Quarter of All Releases**

Figure 20.

### Prison Releases
### October 1, 2004 - September 30, 2007

|  | FY 2005 | | FY 2006 | | FY 2007 | |
| --- | --- | --- | --- | --- | --- | --- |
| Possession of Controlled Substance | 1 | 1,585 | 1 | 1,691 | 1 | 1,848 |
| Distribution of Controlled Substance | 2 | 790 | 2 | 886 | 2 | 836 |
| Robbery 1st | 4 | 672 | 4 | 779 | 3 | 796 |
| Burglary 3rd | 3 | 713 | 3 | 797 | 4 | 790 |
| Theft of Property 1st | 5 | 634 | 6 | 614 | 5 | 590 |
| Felony DUI | 6 | 606 | 5 | 668 | 6 | 571 |
| Poss Marijuana 1st | 7 | 461 | 8 | 493 | 7 | 470 |
| Poss Forged Instrument 2nd | 9 | 347 | 9 | 383 | 8 | 406 |
| Theft of Property 2nd | 8 | 447 | 7 | 542 | 9 | 369 |
| Robbery 3rd | 12 | 262 | 10 | 345 | 10 | 315 |
| Breaking/Entering a Vehicle | 11 | 279 | 15 | 235 | 11 | 291 |
| Receiving Stolen Property 1st | 13 | 249 | 12 | 278 | 12 | 282 |
| Assault 2nd | 10 | 301 | 11 | 280 | 13 | 266 |
| Trafficking Drugs | 14 | 231 | 13 | 250 | 14 | 263 |
| Burglary 1st | 17 | 195 | T17 | 211 | 15 | 222 |
| Receiving Stolen Property 2nd | 18 | 194 | T17 | 211 | 16 | 195 |
| Murder | 16 | 198 | 14 | 240 | 17 | 188 |
| Robbery 2nd | 15 | 203 | 16 | 226 | 18 | 180 |
| Forgery 2nd | 20 | 154 | 20 | 175 | 19 | 170 |
| Burglary 2nd | 22 | 135 | 19 | 178 | 20 | 160 |
| Manufacturing of Controlled Substance 2nd |  | 90 | 21 | 156 | 21 | 141 |
| Poss Fraud Use of Credit/Debit Card | 24 | 102 |  | 81 | 22 | 131 |
| Assault 1st | 19 | 161 | 22 | 151 | 23 | 129 |
| Rape 2nd | 25 | 95 |  | 95 | 24 | 109 |
| Manufacturing of Controlled Substance 1st |  | 76 | 25 | 102 | 25 | 108 |
| Sexual Abuse 1st | 21 | 142 | 24 | 111 |  | 104 |
| Manslaughter | 23 | 126 | 23 | 128 |  | 85 |
| **Top 25 Offenses** |  | **9,282** |  | **10,130** |  | **9,826** |
| Other Offenses |  | 1,059 |  | 1,126 |  | 1,211 |
| **Total Prison Releases** |  | **10,341** |  | **11,256** |  | **11,037** |

**Felony DUI Releases Declined From FY06**

### Prison Releases by Offense Category

Of the major offense categories (personal, property, and drugs), only property offense releases increased in 2007 from 2006. Property releases had a modest increase of 63 releases, while personal releases fell 294 releases and drug releases decreased by 15. However, since 2005 levels, property and drugs releases have increased while only personal releases have dropped.

Figure 21.

### Prison Releases
### Offense Category
### October 1, 2004 - September 30, 2007

**FY05**

**Personal Offense Releases Dropped by Nearly 300 in 2007**



**FY06**



**FY07**



**Prison Releases by Type**

The largest shifts in release types in 2007 from last year's figures are the changes in the percentage of expiration of sentence (without supervision) and parole releases. The percent of releases of offenders ending their sentence without supervision increased by 4 percent while the percent of parole releases decreased by 4 percent. The percent of split sentence and other releases stayed stable during this time period.

Figure 22.

**Prison Releases**
**Type of Release**
**October 1, 2004 - September 30, 2007**

FY05



**EOS Releases Increased by 4% and Parole Releases Dropped by 4% in 2007**

FY06



FY07



tem ——————————————— _ ———————————————

### Prison Releases by Type

The release type showing the most volatility is parole releases showing a range from a low of approximately 100 releases in a month to a high of approximately 350 releases in a month. During this same time period, both split sentence and EOS releases have remained relatively stable and have maintained similar numbers.

Figure 23.

Prison Releases
Type of Release
October 1, 2004 - September 30, 2007



Date of Release

**Prison Releases by Offense Category by Type**

Personal offense releases fell by 10% from FY06, while property and drug offense releases remained stable. Parole and split releases fell across all offense categories. The total number of parole releases fell 15% while the number of split releases fell 4%. EOS releases increased 5% in FY07.

**Parole and Split Releases Were Down for All Offense Categories in 2007**

Figure 24.

**Prison Releases**
**Offense Category by Type**
**October 1, 2002 - September 30, 2007**

|          |      | Parole | Split | EOS   | Other | Total  |
|----------|------|--------|-------|-------|-------|--------|
| Personal | 2003 | 280    | 802   | 773   | 267   | 2,122  |
|          | 2004 | 494    | 848   | 801   | 244   | 2,387  |
|          | 2005 | 727    | 1,039 | 774   | 283   | 2,823  |
|          | 2006 | 928    | 1,071 | 689   | 306   | 2,994  |
|          | 2007 | 779    | 931   | 701   | 289   | 2,700  |
|          |      | *3,208* | *4,691* | *3,738* | *1,389* | *13,026* |
| Property | 2003 | 903    | 1,062 | 1,323 | 230   | 3,518  |
|          | 2004 | 1,630  | 1,133 | 1,096 | 329   | 4,188  |
|          | 2005 | 543    | 1,265 | 1,314 | 321   | 3,443  |
|          | 2006 | 857    | 1,307 | 1,340 | 285   | 3,789  |
|          | 2007 | 739    | 1,298 | 1,415 | 400   | 3,852  |
|          |      | *4,672* | *6,065* | *6,488* | *1,565* | *18,790* |
| Drugs    | 2003 | 1,091  | 1,267 | 1,378 | 207   | 3,943  |
|          | 2004 | 1,571  | 1,381 | 1,120 | 295   | 4,367  |
|          | 2005 | 621    | 1,650 | 1,291 | 291   | 3,853  |
|          | 2006 | 880    | 1,654 | 1,461 | 263   | 4,258  |
|          | 2007 | 755    | 1,637 | 1,558 | 293   | 4,243  |
|          |      | *4,918* | *7,589* | *6,808* | *1,349* | *20,664* |

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

CIVIL CASE NO: 2:07-CV-984-MHT

PATRICK J. CHAREST, Pro-se #182262

PLAINTIFF

Vs.

ALABAMA PARDON & PAROLES, et. al.,

DEFENDANTS.

---

**E X H I B I T
16**

Copy of Defendants' Exhibit-A, "Charest 12/06/2005 Parole Board Denial

---

Prepared by:

Patrick Joseph Charest #182262
LIMESTONE CORRECTIONS
28779 NICK DAVIS ROAD
HARVEST, ALABAMA
35749-7009

STA    BOARD OF PARDONS AND PAROL_S
MONTGOMERY, ALABAMA

ACTION BY THE BOARD

NAME CHAREST PAT              AIS# 182262              DOCKET 02/2005
                                                      1/3    02/08/2005
PAROLE IS THIS DAY ORDERED _____ BY:

MY REASONS FOR FAVORING PAROLE OF THE PRISONER ARE AS FOLLOWS:
_____ SUBJECT HAS SERVED SUFFICIENT PORTION OF SENTENCE.
_____ INVESTIGATION HAS BEEN MADE OF SUBJECT.
_____ SUBJECT'S PAROLE PROGRAM IS ACCEPTABLE.
_____ PRISON AUTHORITY REPORT IS SATISFACTORY.
_____ UPON ACCEPTANCE BY (STATE OF) _____
_____ I AM OF THE OPINION THAT THERE IS A REASONABLE PROBABILITY THAT
        IF THE PRISONER IS RELEASED, (HE/SHE) WILL LIVE AND REMAIN AT
        LIBERTY WITHOUT VIOLATING THE LAW, AND THAT (HIS/HER) RELEASE
        IS NOT INCOMPATIBLE WITH THE WELFARE OF SOCIETY.
_____ INTERVIEWING PAROLE OFFICER RECOMMENDS.
_____ OTHER_____

MEMBER _____ DATE _____

MY REASONS FOR FAVORING PAROLE OF THE PRISONER ARE AS FOLLOWS:
_____ SUBJECT HAS SERVED SUFFICIENT PORTION OF SENTENCE.
_____ INVESTIGATION HAS BEEN MADE OF SUBJECT.
_____ SUBJECT'S PAROLE PROGRAM IS ACCEPTABLE.
_____ PRISON AUTHORITY REPORT IS SATISFACTORY.
_____ UPON ACCEPTANCE BY (STATE OF) _____
_____ I AM OF THE OPINION THAT THERE IS A REASONABLE PROBABILITY THAT
        IF THE PRISONER IS RELEASED, (HE/SHE) WILL LIVE AND REMAIN AT
        LIBERTY WITHOUT VIOLATING THE LAW, AND THAT (HIS/HER) RELEASE
        IS NOT INCOMPATIBLE WITH THE WELFARE OF SOCIETY.
_____ INTERVIEWING PAROLE OFFICER RECOMMENDS.
_____ OTHER_____

MEMBER _____ DATE _____

MY REASONS FOR FAVORING PAROLE OF THE PRISONER ARE AS FOLLOWS:
_____ SUBJECT HAS SERVED SUFFICIENT PORTION OF SENTENCE.
_____ INVESTIGATION HAS BEEN MADE OF SUBJECT.
_____ SUBJECT'S PAROLE PROGRAM IS ACCEPTABLE.
_____ PRISON AUTHORITY REPORT IS SATISFACTORY.
_____ UPON ACCEPTANCE BY (STATE OF) _____
_____ I AM OF THE OPINION THAT THERE IS A REASONABLE PROBABILITY THAT
        IF THE PRISONER IS RELEASED, (HE/SHE) WILL LIVE AND REMAIN AT
        LIBERTY WITHOUT VIOLATING THE LAW, AND THAT (HIS/HER) RELEASE
        IS NOT INCOMPATIBLE WITH THE WELFARE OF SOCIETY.
_____ INTERVIEWING PAROLE OFFICER RECOMMENDS.
_____ OTHER_____

MEMBER _____ DATE _____
SPECIAL CONDITIONS _To detainer and/or program_____

_____

CONTINUED TO _____

_____

PAROLE IS THIS DAY DENIED  12-6-05 _____ BY:
DATE                     MEMBER                        RESET

___12/6/05___    _____    ___12/10___
                 _Baty_                 _12/10_
REMARKS



EXHIBIT
A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

CIVIL CASE NO: 2:07-CV-984-MHT

PATRICK J. CHAREST, Pro-se #182262

PLAINTIFF

Vs.

ALABAMA PARDON & PAROLES, et. al.,

DEFENDANTS.

---

## E X H I B I T
### 17

Charest's Affidavit Supporting Response to Defendant Wynne's 7/02/08 Special Report

---

Prepared by:

Patrick Joseph Charest #182262
LIMESTONE CORRECTIONS
28779 NICK DAVIS ROAD
HARVEST, ALABAMA
35749-7009

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

Patrick Joseph Charest,                          *

              Plaintiff,                        *

Vs.                                              *     **2:07-CV-984-MHT**

Alabama Pardon & Paroles et. al.,                *

           Defendants.                        *

## AFFIDAVIT OF PATRICK J. CHAREST
## IN SUPPORT OF RESPONSE TO DEFENDANT WYNNE'S
## UNSUPPORTED ANSWER AS FILED ON 7/02/08

**STATE OF ALABAMA  :**

**LIMESTONE COUNTY :**

Before me, the undersigned authority did appear one Patrick J. Charest, AIS No: 182262, whom did depose and state under the penalty of perjury the foregoing attestations:

1). My name is Patrick J. Charest, I am an incarcerated convict at Limestone Correctional Facility, I am over the age of nineteen (19) years and remain competent to execute this affidavit, which is based upon both, personal and first hand knowledge of facts surrounding the *"Response* attached hereinafter" –inapposite to Defendant Wynne's mere allegations in his Special Report –presented without any authority or supported by sufficient, evidentiary proof such as an affidavit."

2). I am acting pro se at present and enter **Exhibits 15, 16 and 17** as evidentiary documentation to invalidate "Defendants unsupported allegations from pp. 1 through 11.

3). I sued Defendant's S. Williams (now superseded by B. Wynn), V. Weatherly and R. Longshore in their specific capacities while they were acting under color of state law,

because they collectively, separately or otherwise individually conspired to violate  my Constitutional rights -which I know reasonable persons would have known not to have subjected me to —to date Defendant Wynne has "wholly failed to submit an evidentiary proof in the form of an    AFFIDAVIT to support his Special Report," now ripe for limited summary judgment in favor of Charest's uncontradicted set of "facts sufficiently pled."

4).     I assert, aver that the specific "Facts, Legal Arguments enumerated between pages 1 –67 attached hereinafter are adopted and fully incorporated to supporting Charest's legal position warranting per se prospective (i) declaratory and (ii) injunctive relief for his constitutional parole board determination under the progeny of *Wilkinson v. Dotson*.

5).     I assert, aver and that Defendant Wynne did in fact, hear and rely on "*false information, testimony*," which was in fact relied upon by the 12/06/2005 parole board to deny parole —setting-off Charest until 2010, violating the Fourteenth and Fifth Amendment in accord with the United States Constitution proscriptions.

Additionally, I maintain that (i) M. Shehane and / or (ii) M. LeBreton did speak on 12/06/2005 inapposite to the 640-X guidelines in effect when I was originally convicted / sentenced thereby violating, *inter alia*, the **ex post facto clause** of the U.S.Const.

6).     I assert, aver that as a direct result from the Board's amended post 2002 –2004 Articles do in fact violate the *gateway* holding handed down in the progeny of *Wilkinson v. Dotson,* entitling me facially, per se, too prospective (i) *declaratory* and (ii) *injunctive* relief for the constitutional deprivations suffered -cause for the parole board determination to be duly remanded, reversed absent Defendants unconstitutional acts, actions or outright flagrant usurpations of both state law in accord with proscriptions from the U.S. Constitution, *inter alia*..

2

7).    I maintain that at no time did I ever attempt, nor argue a "*liberty interest*," claim before this Court contrary to Defendants mere allegations regarding one existing. Defendant Wynne is quite disingenuous in an attempt to bolster such an allegation, knowing such would in fact guarantee a ruling in law down such vein, however I assert absent more from merely saying [it] remains nothing other than a sham pleading.

11).    I assert, aver under the penalty of perjury that upon DISCOVERY -Defendants V. Weatherly and R. Longshore revealed to me, this Court, that two others denied me parole during the 2005 hearing, and that, it was these two (2) "*special members*," as appointed, assigned to "*determine*" the probability of my ability to remain in society absent violating the law, giving rise to amend said instant §1983 COMPLAINT to the actual, person(s) – part(ies) responsible for usurping State law, and my constitutional rights, see attached argument / facts warranting statutory relief for Wynne's and Mr. McGriff's failures to adhere to §§15-22-20(j)(k) –whilst performing discretionary tasks in Defendant S. Williams absence.

14).    I maintain, inapposite to Defendant Wynne's allegations in his Special Report, from pages three (3) through eleven (11) –for the most part, that Defendant Wynn is merely attempting to entangle, twist and outright thwart my "*true issues*" before this Court, see attached –coupled *Response pp. 1 –68* and the referenced exhibits therein, inclusive to, but not limited to Exhibits 15, 16 and 17 attached herein adopted and fully incorporated factually presenting my legal position to moot Wynn's defense.

15).    I assert, aver and adopt as referenced in my attached "*Response* at pp. 28 –31 at §§ 9 –12 predicates Defendant Wynne's acts, actions or omissions violated the Board's 640-X regulations in effect at the time of my conviction / sentencing in 1995 –inapposite to Defendants' Exhibit-A form submitted March 14, 2008, warranting per se prospective (i)

3

declaratory and (ii) injunctive relief for my constitutional parole board determination under the progeny of *Wilkinson v. Dotson*, *inter alia*.

16).    I assert, aver and adopt as referenced in my attached "*Response* in pp. 31 –38 at §13 and again in pp. 59 -64 at §§ 24 –which presents the dissimilarities Defendant Wynne unconstitutionally applies to my distinct Class A felony offense, inapposite to other similar situated Class A felons, and the other less violent offense categories –whom are granted, given different treatment –merely based upon unconstitutional strictures being applied to my incarceration and parole (i) *eligibility* and (ii) consideration by the Board's amended Articles which remains the two fold cause for my "*equal protection*" claim.

17).    I assert, aver and adopt as referenced my attached "*Response* in pp. 30 -38 at §10, argued through **Exhibit-11(a)** (Quentin Gales AIS #174529 September 2001 Parole Board form")(see "Charest's Response / Reply exhibits on 04/15/08") –predicating actions by three (3) parole board members "granting" parole, representing "partial accordance" with State law –in comparison with my Exhibit-4 (640-X-3-.04 Interview / File Review Worksheet)(see "Charest's Response / Reply exhibits on 04/15/08") either denying or granting of Parole which "*factually*" asserts specific reasons for either, all of which Charest maintains he was arbitrarily, capriciously denied by Defendant Wynne – one of the two (2) special parole board members so named; also referenced for review, and argued through Charest's **Exhibit-11(b)** (Quentin Gales AIS #174529 May 2006 Parole Board form)(see "Charest's Response / Reply exhibits on 04/15/08") predicating actions by all three (3) parole board members "denying" parole, setting Gales off one (1) year before being *eligible for parole consideration* (5/2007) –which is "partially" in accord with State law –inapposite to Charest's Exhibit-10 predicating only two (2) signatures a violation of §§15-22-20(j)(k), Code of Alabama, 1975; again referenced, and

argued through Charest's **Exhibit-11(c)** (Quentin Gales AIS #174529 May 2007 Parole Board form)(see "Charest's Response / Reply exhibits on 04/15/08") predicating actions by all three (3) parole board members *"denying"* parole, setting Gales off one (1) year before being *eligible for parole consideration* (5/2008) —which is *"partially"* in accord with State law inapposite to Charest's Exhibit-10 predicating only two (2) signatures a violation of inherent strictures §§15-22-20(j)(k), Code of Alabama, 1975, inclusive to the set off increase -warranting per se prospective (i) declaratory and (ii) injunctive relief for his constitutional parole board determination under the progeny of <u>*Wilkinson v. Dotson*</u>.

18). I assert, aver and adopt as referenced in my attached *"Response* at p. 31 §11 argued through Charest's **Exhibit-12** (Willie Lee White AIS# 140147 September 2005 Parole Board form") (see "Charest's Response / Reply exhibits on 04/15/08") predicating actions by all three (3) parole board members *"denying"* parole, setting White off three (3) years before *eligible for parole consideration* (3/2009) —which is *"partially"* in accord with State law inapposite to Charest's Exhibit-10 predicating only two (2) signatures a violation of inherent strictures §§15-22-20(j)(k), Code of Alabama, 1975, inclusive to Charest's five (5) year set off increase -warranting per se prospective (i) declaratory and (ii) injunctive relief for his constitutional parole board determination under the progeny of <u>*Wilkinson v. Dotson*</u>.

19). I assert, aver and adopt as referenced in my attached *"Response* in p. 31 §13 and argued through Charest's **Exhibit-13** (Bernies Burnett, AIS# 132146 October 2006 Parole Board form")(see "Charest's Response / Reply exhibits on 04/15/08") predicating actions by all three (3) parole board members "denying" parole —which is *"partially"* in accord with State law inapposite to Charest's Exhibit-10 predicating only two (2) signatures a violation of inherent strictures §§15-22-20(j)(k), Code of Alabama, 1975,

5

inclusive to Charest's five (5) year set off increase -warranting per se prospective (i) declaratory and (ii) injunctive relief for his constitutional parole board determination under the progeny of *Wilkinson v. Dotson*.

20).  I maintain, that the deprivations suffered are the proximate cause –for the injuries, stemming from Alabama's unconstitutional parole board guidelines enacted in 2002 and 2004 –utilized by Defendant Wynne and Mr. McGriff inapposite to State statutory mandates to-wit: §§15-22-20(j)(k), *inter alia*, when viewed under the progeny of cases presented in Charest "*Response* pp. 1 through 68 at §§1 -26," –whereas the United States Supreme Court in *Wilkinson v. Dotson* held such applications to be both (i) unconstitutional and (ii) *ex post facto* violations which Charest requests this Court take judicial notice of, in addition too, the decision referenced in Charest's **Exhibit-14** (Bostwick v. Alabama Board of Pardon & Paroles @ 865 So.2d 1245; 2003 Ala.Crm.App. LEXIS 88)(see "Charest's Response / Reply exhibits on 04/15/08"), as argued in the attached *Response* at pp. 47 -50 at §§ 17 -18.

21).  I have personal, first hand knowledge that Alabama State "statutes" authorizing these "*special members*" the discretionary power to review my parole consideration in 2005 utilized "*false and erroneous*" information, not to mention failed to follow State law to-*wit:* (§§15-22-20(j)(k)) from either or both (i) M. Shehane and / or (ii) M. LeBreton which was relied upon by Defendant Wynne denying me parole," inapposite to the strictures of *Wilkinson v. Dotson, inter alia*.

22).  I was treated dissimilar to likened others when reviewed, denied for parole, see referenced Exhibits 10 through 13 in Charest's Response / Reply exhibits on 04/15/08 constituting, some of the class, group discrimination in violation of Federal law, along with the current attached **Exhibit –15** (Alabama's 2008 Sentencing Commission Report.

6

23).    The class membership that the parole board has stigmatized upon me as being difficult to parole remains inapposite with the constitutional treatment given, granted other members of similar likened crimes –as legally considered to society as being "violent," therefore being convicted of "rape" makes me no more dangerous nor incompatible to society's welfare than those convicted of "murder, robbery, arson, kidnapping, trafficking, assault, sexual abuse and other lewd and lascivious acts," as defined by Alabama's legislation at §15-18-171(14), Code of Alabama, 1975 (Act 1991, No. 91-441, p. 795, § 2; Acts 2003 –353, p. 930, § 1).

24).    I maintain, assert that at no time have I been given, granted my constitutional prescribed discretionary parole consideration in accordance with U.S. Constitution thereby violating my Fifth and Fourteenth Amendments proscriptions that I'm adopting and fully incorporating as same –hereinafter, inclusive to the right to a jury trial based upon the *evidentiary materials* presented under Federal Rule of Evidence.

AFFIANT SAYETH NOTHING FURTHERMORE:

Done so this _____ day of _____, 2008.

[ S E A L ]

_____

**Notary Public at Large, Alabama**


_____

**COMMISSION EXPIRES:**

**AFFIANT** Patrick J. Charest
Pro-se' #182262
Limestone Correctional Facility
28779 Nick Davis Road
Harvest, Alabama 35749-7009


Sworn to and subscribed heretofore this _____ day of _____, 2008.

7